# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUSAN TSUI GRUNDMANN,<br><br>        *Plaintiff*,<br><br>    vs.<br><br>DONALD J. TRUMP, in his official capacity as President,<br><br>      and<br><br>COLLEEN DUFFY KIKO, in her official capacity as chairman of the Federal Labor Relations Authority,<br><br>     *Defendants*. | Case No. 1:25-CV-00425-SLS<br><br>**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

   I.   5 U.S.C. § 7104(b) IS CONSTITUTIONAL. ................................................ 2

      A.  *Humphrey's Executor* governs this case ........................................ 3

      B.  Contrary to Defendants' position and consistent with *Humphrey's Executor*, the three-member, bi-partisan Authority is a traditional independent agency that is predominantly quasi-judicial in its purpose, power, and function as opposed to executive. ................................................................................................ 4

      C.  The Authority's limited executive authority is largely concentrated in its General Counsel and Chairman, and those positions are not subject to removal limitations. ........................................................................................... 9

  II.  PLAINTIFF GRUNDMANN IS ENTITLED TO A PERMANENT INJUNCTION. ....................................................................................... 11

 III.  PLAINTIFF HAS SUFFERED IRREPARABLE HARM, AND INJUNCTIVE RELIEF IS THE ONLY ADEQUATE REMEDY ............................... 15

 IV.  The Balancing Of The Equities And The Public Interest Weigh In Favor Of Plaintiff. ............................................................................................. 18

CONCLUSION AND RELIEF REQUESTED ........................................................... 22

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Berry v. Reagan,*
   Civ. A. No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) ..........................................16, 20

*Caterpillar Inc. v. Williams,*
   482 U.S. 386 (1987).......................................................................................................12

*Collins v. Yellen,*
   594 U.S. 220 (2021).........................................................................................................4

*Consumer's Research v. Consumer Prod. Safety Comm'n,*
   91 F.4th 342 (5th Cir. 2024) ............................................................................................4

*Ctr. for Democracy & Tech. v. Trump,*
   507 F. Supp. 3d 213 (D.D.C. 2020)................................................................................13

*Dellinger v. Bessent,*
   2025 WL 471022 (D.D.C. Feb. 12, 2025) ......................................................................15

*Fed. Election Comm'n v. NRA Pol. Victory Fund,*
   6 F.3d 821 (D.C. Cir. 1993)...........................................................................................8, 9

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992).......................................................................................................12

*Free Enter. Fund v. Pub. Co. Acct. Oversight Board,*
   561 U.S. 477 (2010).........................................................................................................4

*Harris v. Bessent,*
   Civ. A. No. 1:25-cv-00412-RC, 2025 WL 521027 (D.D.C. Feb. 18, 2025) .................. *passim*

*Humphrey's Executor v. United States,*
   295 U.S. 602 (1935)................................................................................................ *passim*

*Leachco, Inc. v. Consumer Prod. Safety Comm'n,*
   103 F.4th 748 (10th Cir. 2024), *cert. denied*, No. 24-156,
   2025 WL 76435 (Jan. 13, 2025) ......................................................................................8

*League of Women Voters of United States v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016)...........................................................................................18

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010).......................................................................................................11

*Morrison v. Olson*,
  487 U.S. (1988) ............................................................................................4, 5, 9

*Myers v. U.S.*,
  272 U.S. 52 (1926) ................................................................................................12

*Nat'l Treasury Emps. Union v. Nixon*,
  492 F.2d 587, 616 (D.C. Cir. 1974) .....................................................................13

*Nat'l Wildlife Fed'n v. U.S.*,
  626 F.2d 917 (D.C. Cir. 1980) .............................................................................13

*National Treasury Employees' Union v. Trump*,
  Case No. 25-cv-420 (CRC), 2025 WL 561080 (D.D.C. Feb. 20, 2025) ...............20

*PHH Corp. v. Consumer Fin. Prot. Bureau*,
  881 F.3d 75 (D.C. Cir. 2018) .................................................................................5

*R.I.L-R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015) ...................................................................18, 21

*Sampson v. Murray*,
  415 U.S. 61 (1974) ................................................................................................16

*In re Sawyer*,
  124 U.S. 200 (1888) ..............................................................................................15

*SEC v. Blinder, Robinson, & Co.*,
  855 F.2d 677 (10th Cir. 1988) ................................................................................8

*Seila Law v. Consumer Financial Protection Bureau*,
  591 U.S. 197 (2020) ....................................................................................*passim*

*Severino v. Biden*,
  581 F. Supp. 3d 110 (D.D.C. 2022), *aff'd*, 714 F.4th 1038 (D.C. Cir. 2023)..............13, 14

*Sierra Club v. Van Antwerp*,
  719 F. Supp. 2d 77 (D.D.C. 2010) ........................................................................11

*Spicer v. Biden*,
  575 F. Supp. 3d 93 (D.D.C. 2021) ........................................................................14

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) .................................................................12, 13, 14, 15

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
  402 U.S. 1 (1970) ..................................................................................................15

*United States v. Perkins*,
   116 U.S. 483 (1886)..................................................................................6

*Wiener v. United States*,
   357 U.S. 349 (1958)................................................................................18

**Statutes**

5 U.S.C. § 3345 et seq................................................................................9

5 U.S.C. § 7101(a)(1) and (a) 2................................................................19

5 U.S.C. § 7101(a)(2)................................................................................19

5 U.S.C. § 7103(3)(F) and (G)....................................................................6

5 U.S.C. § 7104.............................................................................. *passim*

5 U.S.C. § 7104(b)....................................................................................1, 2

5 U.S.C. § 7104(f).....................................................................................3, 9

5 U.S.C. § 7105(a)(2)..................................................................................6

5 U.S.C. § 7134...........................................................................................8

16 U.S.C. §§ 1600 et seq...........................................................................13

**Other Authorities**

Agency Independence, 121 Columbia Law Review 1, 72-79 (2021)...............3

Executive Order No.14215, 90 Fed. Reg. 10447 (Feb. 18, 2025)..................2

**INTRODUCTION**

This is the rare case where the material facts are undisputed (*see* Defendants' Statement of Undisputed Material Facts and Response to Plaintiffs' Statement of Material Facts, ECF No. 12) and the Defendants do not deny that these material facts demonstrate a violation of the governing statute. Defendant Trump's action of removing Plaintiff Susan Tsui Grundmann as a Member of the Federal Labor Relations Authority ("FLRA" or "Authority") without notice and a hearing and without demonstrating inefficiency, neglect, or malfeasance in office violates 5 U.S.C. § 7104(b). This is sufficient to establish that Plaintiff is entitled to summary judgment, declaratory relief that the President violated the law, and a finding of success on the merits as it pertains to injunctive relief.

Defendants' only defense to Plaintiff's Motion for Summary Judgment and the basis for their own Motion for Summary Judgment is that 5 U.S.C. § 7104(b) is unconstitutional because it places any limit at all on the right of the President to remove any Member of the Authority. *See* Memorandum in Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Preliminary Injunction and Summary Judgment, ECF No. 11-1 and 12 (Defs.' Br.). But the seminal Supreme Court case *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), upholds Congress's authority to place cause-like conditions on the President removing a Member of a multi-member, bipartisan body of an independent agency like the Authority. Defendants' efforts to minimize the continued vitality of *Humphrey's Executor* by pointing to the Supreme Court decision in *Seila Law v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020), are undermined by the *Seila Law* decision itself. Their attempts to differentiate the facts here from those of *Humphrey's Executor* similarly fall flat.

Defendants' remaining arguments challenge whether this Court has the authority to award injunctive relief and whether an injunction is warranted under the irreparable harm, balance of harms, and public interest and equity factors. These arguments are also unavailing. The case law permits courts to award equitable, injunctive relief in circumstances such as those here. Similarly, the act of improperly removing a member of a federal independent agency leadership body in clear violation of a statute causes irreparable because it prevents her from performing her Congressionally mandated duties. Finally, the balance of harms and public interest factors favor Plaintiff because of the interest of Plaintiff and that of the public in having Authority members who can act independently without fear of reprisal. Additionally, the dramatic changes the President is currently making to the federal workforce implicates the Authority's charge and makes a having a fully constituted Authority is more important than ever.

## ARGUMENT

## I.    5 U.S.C. § 7104(b) IS CONSTITUTIONAL.

Defendant Trump has the clear desire to exert total control over the federal workplace. This includes independent federal agencies as demonstrated by the recent Executive Order No.14215, 90 Fed. Reg. 10447 (Feb. 18, 2025), which focuses on increased Presidential control over independent federal agencies.  This effort at Presidential control also extends to removing members of independent agency leadership bodies, including Ms. Grundmann and others. In this case, Defendant Trump's action runs headlong into 5 U.S.C. § 7104, which clearly bars such conduct.

Defendants' only recourse is to contend that 5 U.S.C. § 7104 is unconstitutional. Here, the problem they run into is the longstanding *Humphrey's Executor* exception, which has permitted Congress to impose reasonable conditions on Presidential removal of members of independent

leadership bodies. As with the leadership structure of numerous independent bodies,[1] Congress modeled the leadership structure of the Authority with *Humphrey's Executor* in mind. Indeed, the structure of the Authority closely follows the core characteristics of the *Humphrey's Executor* exception: it is a multimember group of experts, with a partisan balance and staggered terms, that performs predominantly quasi-judicial functions. As in *Humphrey's Executor*, the Authority also has a removal standard that requires inefficiency, neglect, or malfeasance in office. Congress consciously left most of the executive functions to the General Counsel of the Authority and explicitly made that position removable at will by the President. 5 U.S.C. § 7104(f).

### A.    *Humphrey's Executor* governs this case.

Defendants make a variety of arguments as to why *Humphrey's Executor* is not controlling. The broadest reaching of those arguments is that after *Seila Law*, "little remains of *Humphrey's Executor*." Defs.' Br. 10 & n.2. If this argument reflected the law, the removal protections for virtually all independent agencies would be constitutionally vulnerable. This lead argument Defendant Trump is advancing is consistent with his view of unitary executive power.

But *Seila Law* does not actually do the work that Defendants wish. To begin with, the Court in *Seila Law* expressly stated *twice* that its decision did not "revisit" *Humphrey's Executor* or its other removal precedents. *Seila Law*, 591 U.S. at 204, 228. The Court also contrasted the "traditional independent agency headed by a multimember board or commission," *id.* at 207, like in *Humphrey's Executor* and here, favorably in comparison with the "historical anomaly" of the CFPB single-Director structure in *Seila Law* which it found was "incompatible" with our constitutional structure.

---

[1] For a list of independent agencies for which Congress included some limitations on removal see Jane Manners and Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. Law Rev. 1, 72–79 (2021).

Moreover, when the Court in *Seila Law* began its legal analysis of determining whether the CFPB Director leadership structure was constitutional, it used the leadership body structure of the FTC in *Humphrey's Executor* as the constitutional baseline for comparison. *Id.* at 218. The Court looked unfavorably at the CFPB structure because, unlike the FTC, it was not a multimember, politically diverse group of officials. *Seila Law*, 591 U.S. at 218. The Court also noted that the CFPB, unlike the FTC, lacked staggered terms to "prevent[] complete turnovers in agency leadership and guaranteed that there would be some Commissioners who accrued extrapolated expertise." *Id.* Based on both *Humphrey's Executor* and *Seila Law*, the fact that the FLRA is a bipartisan, multimember body with some members always having expertise supports the constitutionality of the removal clause.

The Defendants' argument that this Court should treat *Humphrey's Executor* like it was implicitly overturned is both brazen and contrary to what the Supreme Court did in word and practice in *Seila Law*. As the Fifth Circuit started in upholding the removal provision of the Consumer Product Safety Commission: "[H]ere, *Humphrey's* does settle the question. Only the Supreme Court has power to reconsider that New Deal-era precedent—perhaps reaffirming it, overruling it, or narrowing it—and at least so far, it hasn't." *Consumer's Research v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 356 (5th Cir. 2024).[2]

---

[2] In addition, both before and after *Seila Law*, the Supreme Court has reaffirmed *Humphrey's Executor* as precedent. *See, e.g.*, *Collins v. Yellen*, 594 U.S. 220, 251 (2021); *Morrison v. Olson*, 487 U.S. at 654, 688 & n.25 (1988) (recognizing that *Humphrey's Executor* is still good law); *Free Enter. Fund v. Pub. Co. Acct. Oversight Board*, 561 U.S. 477, 483 (2010) (declining to "reexamine" *Humphrey's Executor*).

**B.**    **Contrary to Defendants' position and consistent with *Humphrey's Executor*, the three-member, bi-partisan Authority is a traditional independent agency that is predominantly quasi-judicial in its purpose, power, and function as opposed to executive.**

Following the teachings of *Humphrey's Executor*, Congress designed the FLRA as "a traditional independent agency" "run by a multimember board." *Seila Law*, 591 U.S. at 206. Defendants' assertion that *Seila Law* stands for the proposition that if an independent agency exerts any executive power, it falls outside of the *Humphrey's Executor* exception, Defs.' Br. 12, does not square with the actual holding of *Seila Law*.  Admittedly, the *Seila Law* decision uses different language in different parts of the opinion, sometimes discussing whether the agency in question wields "significant" executive power, 591 U.S. at 199, 220, other times "substantial" executive power, *id.* at 218, and other times "any" executive power. *Id.* at 216. But when the Supreme Court in *Seila Law* defined the two exceptions to when the President does not have at-will removal authority (the *Humphrey's Executor* exception and the exception for inferior officers that does not apply here), it used the term "substantial":

> These two exceptions—one for multimember expert agencies that do not wield *substantial* executive power, and one for inferior officers with limited duties and no policymaking or administrative authority—"represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power."

*Id.* at 220 (quoting *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 196 (D.C. Cir. 2018) (emphasis added). Thus, "substantial executive power" is the best expression of the demarcation line between an independent agency that falls within *Humphrey's Executor* and one that does not.

Moreover, the Supreme Court in *Humphrey's Executor* defined what functions are executive as opposed to quasi-legislative and quasi-judicial differently than the Defendants do. As discussed more fully below, the Court in *Humphrey's Executor* set forth the functions of the FTC, which included issuing complaints and show cause orders, ruling on matters, seeking enforcement

of its orders in federal court, and serving as a master of chancery to federal courts. *Humphrey's Executor*, 295 U.S. at 620-21. Subsequently, in *Morrison v. Olson*, 487 U.S. 654 (1988), the Court has since acknowledged that some of the functions identified as quasi-legislative or quasi-judicial functions in *Humphrey's Executor* could be considered as executive, "at least to some degree," *id.* at 689 n.28, while acknowledging that *Humphrey's Executor* remains good law. *Id.* at 688 & n.25.

Here, like the multimember FTC—and entirely unlike the single-director CFPB—the powers that Congress bestowed on the Authority are not "significant" nor "substantial" executive authority as Defendants. Defs.' Br. 7–12.  Indeed, the Statute makes plain that the vast majority of the FLRA's functions are evidently quasi-judicial, just like those of the FTC.  Indeed, the three-Member Authority predominantly acts as an appellate body, hearing disputes after factfinding has occurred in arbitration (reviewing exceptions to awards) or reviewing decisions of inferior administrative law judges. 5 U.S.C.A. § 7105(a)(2).  While the FLRA does have some decision-making authority, those powers are either procedural or adjudicative in nature and therefore dissimilar to typical, discretionary executive functions.  For instance, the FLRA assesses whether an executive agency committed an unfair labor practice, the roles of employees properly included in a bargaining unit, and whether and when bargaining should occur during the term of a collective bargaining agreement. The answers to such questions in any given case presented to the Authority make clear the quasi-judicial nature of its role.

Critically, the Authority only can preside over disputes involving a circumscribed scope of executive branch agencies.  For example, it **cannot** preside over disputes involving the labor organization representing the Authority's **own** employees or those involving the Federal Service Impasses Panel (which was created by the same Statute).  5 U.S.C. § 7103(3)(F) and (G) (emphasis added). This underscores how Congress designed the Authority by necessity to be

independent from the parties whose disputes it would be assessing. *Accord Harris v. Bessent*, Civ. A. No. 1:25-cv-00412-RC, 2025 WL 521027, at *5 & n.2 (D.D.C. Feb. 18, 2025) (citing *United States v. Perkins*, 116 U.S. 483, 485 (1886)) (recognizing Supreme Court approval for Congressional limitations on removal due to statutory need for independence).

Nothing in Defendants' Opposition undermines this conclusion. Indeed, Defendants fails to explain in any detail how the Authority could possibly wield "substantial executive power" as the Supreme Court determined was required for at-will removal in *Seila Law*. Setting aside the conclusory assertion that the FLRA functions under the ambit of the Executive branch, the FLRA's functions highlighted by Defendants illustrate that the Authority functions as a quasi-judicial body **without** substantial executive authority. Simply stated, if Defendants' position were correct, then virtually any function of the government could be recharacterized as "executive" simply by virtue of an agency having any discretion over any decisions. This contention is truly the exception that swallows the rule and must be rejected.

Defendants point to the Authority's power to investigate and adjudicate disputes over unfair labor practices, to order legal and equitable remedies, and to enforce compliance with its orders. But none of those powers distinguish the Authority from the FTC as analyzed in *Humphrey's Executor* At the time *Humphrey's Executor* was decided, the FTC had broad authority "to prevent persons, partnerships, or corporations . . . from using unfair methods of competition." *Humphrey's Executor*, 295 U.S. at 620. The FTC was empowered to carry out this purpose by issuing complaints and show cause orders against those it believed may have violated the law. After issuing the order to show cause, it would then hear the matter and issue written findings of fact. Where it believed there was a violation of the law, it could issue a cease a desist order. If the charged party violated the cease-and-desist order, the Commission could then apply to the circuit court of appeals for

enforcement of the order. *Id.* at 620–21. The charged party also retained the right to appeal a decision of the Commission to the circuit court of appeals. *Id.* The governing statute also provided that the Commission could serve as a master in chancery to which a federal court could refer antitrust violations to advise the court on a proper remedy. *Id.* at 621. The Supreme Court in *Humphrey's Executor* found that these sorts of activities were not executive, implicitly finding them to be quasi-judicial.

Courts since have made similar determinations regarding other agencies based on *Humphrey's Executor. See, e.g., Harris*, 2025 WL 521027, at *3 (rejecting the government's argument "that *Humphrey's Executor* does not apply" to the Merit Systems Protection Board because "it may issue orders to federal employees, adjudicate and take final action, and litigate on its own behalf"); *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 762 (10th Cir. 2024), *cert. denied*, No. 24-156, 2025 WL 76435 (Jan. 13, 2025) (upholding removal protections for the Consumer Product Safety Commission, which "has investigatory powers, as well as civil and criminal enforcement powers"); *SEC v. Blinder, Robinson, & Co.*, 855 F.2d 677, 682 (10th Cir. 1988) (noting that *Humphrey's Executor* "stands generally for the proposition that Congress can, without violating Article II, authorize an independent agency to bring civil law enforcement actions where the President's removal power was restricted"); *Fed. Election Comm'n v. NRA Pol. Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993) (upholding the constitutionality of the Federal Election Commission's enforcement authority and power to order retrospective remedies).

Defendants also point to the Authority's power to "prescribe rules and regulations to carry out" the Statute's provisions. Defs' Brief at 9 (quoting 5 U.S.C. § 7134). Such power, however, does not distinguish the Authority from the FTC or the principles enshrined in *Humphrey's Executor*. The Supreme Court has consistently upheld removal protections "for so-called

'independent regulatory agencies,' such as the Federal Trade Commission, the Interstate Commerce Commission, and the Consumer Product Safety Commission, which engage substantially in what has been called the 'quasi-legislative activity' of rulemaking." *Morrison*, 487 U.S. at 724–25 (citations omitted). In *FEC v. NRA Political Victory Fund*, for example, the D.C. Circuit relied on *Humphrey's Executor* and *Morrison* to uphold the constitutionality of the Federal Election Commission, which is "patterned on the classic independent regulatory agency" and can both make rules and order retrospective remedies. 6 F.3d at 826.  That the FLRA rarely exercises its rulemaking authority – and, when it does, is generally procedural in nature – is also ignored by Defendants.

### C. The Authority's limited executive authority is largely concentrated in its General Counsel and Chairman, and those positions are not subject to removal limitations.

To the extent the Authority exercises any executive power, it is through the appointment of a General Counsel and selection of Chairman, whose selection permits the President to immediately influence the policy and direction of the Authority.  Defendants entirely fail to recognize how the Statute separates these functions from those exercised by the three-Member Authority.

The General Counsel acts as the Authority's prosecutor in chief, bringing forward cases to be heard based on disputes between unions and executive agencies.  It is the General Counsel who is empowered to advance the Executive's point of view and policy priorities with respect to the Authority, by investigating alleged unfair labor practices and filing and prosecuting complaints.  5 U.S.C. § 7104(f).  It is the General Counsel—and not the three-Member Authority—who has "direct authority over, and responsibility for, all employees in the office of General Counsel, including employees of the General Counsel in the regional offices of the Authority." *Id.*

9

Unlike Members of the Authority, the General Counsel "**may be removed at any time by the President**." *Id.* (emphasis added). Further, the President is permitted, by the Federal Vacancies Reform Act of 1998, 5 U.S.C. §§ 3345 *et seq.*, to appoint an acting General Counsel even without Senate approval—a right the President does not have with respect to Members of the Authority. Accordingly, the President could lawfully begin to impact Authority activity immediately by selecting and appointing an individual in this capacity.

The Executive can also influence Authority activity by his designation of one of its Members to serve as Chairman, a role that the Statute describes as "the chief executive and administrative officer of the Authority." 5 U.S.C. § 7104(b). This is the only role within the three-Member Authority that serves any significant quasi-executive function. Accordingly, the designation of Chairman is one that can be bestowed or revoked at will by the Executive. This right stands in contrast to the notice, cause, and hearing limitations placed on the President's removal of Members. Applying this standard to Plaintiff Grundmann's unilateral removal, the President could lawfully remove her Chairman designation but could not lawfully terminate her status as a Member of the Authority without providing her notice, cause and a hearing—none of which occurred.

Congress's decisions to largely concentrate the executive function in the General Counsel, and make that position removable at will by the President, to enable the President to designate the Chairman of the FLSA who serves as the chief executive and administrative officer of the Agency, and to enable the President to select a Member of the Authority no less than once every two years all demonstrate that Congress properly balanced providing the Authority, as an agency with predominantly quasi-judicial functions, with independence from at-will removal while giving the President an appropriate amount of influence.

10

In sum, Defendants' arguments challenging the constitutionality of 5 U.S.C. § 7104 ultimately fail because *Humphreys' Executor* remains good law and Congress constructed the Authority to closely track the requirements of *Humphreys' Executor*. Defendants also fail to appreciate the differences between the quasi-executive authority exercised by the General Counsel and the Chairman as distinct to the quasi-judicial role of the multimember Authority. For all these reasons, Plaintiff Grundmann is entitled to summary judgment and a finding on the merits for purposes of injunctive relief.

## II.    PLAINTIFF GRUNDMANN IS ENTITLED TO A PERMANENT INJUNCTION.

A plaintiff seeking permanent injunctive relief must demonstrate that (1) they will suffer irreparable injury; (2) the remedies available at law are inadequate to compensate for that injury; (3) considering the balance of hardship between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 79 (D.D.C. 2010) (*quoting Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010).

Plaintiff Grundmann can establish all four requirements. As such, the Court should enter an Order: (1) declaring that the act of removing Plaintiff Grundmann from the Federal Labor Relations Authority is *void ab initio* under 5 U.S.C.§ 7104 and (2) enjoining Defendant Kiko from precluding Plaintiff from carrying out her statutory duties as Member of the Authority and restoring immediately all powers and privileges of such appointment.

At the outset, Defendants advance three arguments calling into question this Court's power to grant injunctive relief in the first instance. First, Defendants say that most plaintiffs in these cases seek backpay, presumably because they think that is all the relief the Court may grant here. Defs.' Br. 12. Second, they contend that the President should not be forced to retain an officer

"whom he no longer believes should be entrusted with the exercise of executive power." Defs.' Br. 13. Third, they argue that the Court does not have power to issue injunctive relief to permit Plaintiff to resume her duties, where only the President may wield the constitutional appointment and removal powers to "reinstate" Plaintiff. These arguments can be easily dispatched.

As to the first point, "the plaintiff is the master of the complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 388–89 (1987). Plaintiff does not seek backpay but wishes to resume her duties to as a Member of the FLRA. Thus it is irrelevant that the plaintiffs in *Humphrey's Executor*, 295 U.S. at 612 or *Myers v. United States*, 272 U.S. 52, 106 (1926), or in any of the other cases for that matter, Defs.' Br. 12, sought backpay instead of an injunction.

With respect to Defendants' second argument, the President's belief that Plaintiff cannot be "entrusted" to carry out her duty fails to constitute any valid grounds for denying an injunction. Defs.' Br. 13. As discussed in detail above, the President's removal power as to Plaintiff is circumscribed by congressional mandate, *i.e.*, only for cause.  5 U.S.C. § 7104 ("only upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office."). Plaintiff Grundmann's removal, however, was unlawful and violated the plain language of Section 7104. That the President no longer wishes Plaintiff Grundmann to remain on the FLRA is not a sufficient bases to deny Plaintiff an injunction that would otherwise permit her to resume her lawful duties.

Finally, to the extent that Defendants take the position that this Court may not order injunctive relief *against the President*, that limitation hardly precludes Plaintiff Grundmann from seeking injunctive relief against subordinate officials which she has done here. Unsurprisingly, courts rarely order relief against the President, to avoid having to "delv[e] into complicated and exceptionally difficult questions regarding the constitutional relationship between the judiciary and the executive branch." *Swan v. Clinton*, 100 F.3d 973, 981(D.C. Cir. 1996); *Franklin v.*

*Massachusetts*, 505 U.S. 788, 803 (1992).[3] But that constraint has not stopped courts from "fashioning relief" against defendants other than the President who have the power "to treat plaintiffs [removed pursuant to the President's removal powers] as full members of the board." *Severino v. Biden*, 581 F. Supp. 3d 110, 116 (D.D.C. 2022), *aff'd*, 714 F.4th 1038, 1043 (D.C. Cir. 2023).

In *Swan*, the D.C. Circuit addressed whether the plaintiff, who had been removed by the president as a board member of the National Credit Union Board, could obtain injunctive relief against officials other than the president. 100 F.3d at 979. The court explained, "the question was not whether subordinate officials have the legal power to remove or reinstate NCUA Board members," but "rather whether injunctive relief against such officials alone could provide Swan with an adequate remedy, despite the fact that only the president has the power to officially remove . . . Swan." *Id.* at 979. The court found that subordinate officials could "accomplish these deeds de facto by treating Swan as a member of the NCUA Board and allowing him to exercise the privileges of that office," *id.* at 980, such as by including Swan in Board meetings, giving him access to his former office, recording his votes as official, and allowing him to draw a salary of a

---

[3] Nowhere in their brief do Defendants address Plaintiff's request for declaratory relief in depth, other than acknowledging that Plaintiff requested it. Defs'. Br. 13. The case law provides support for the Court issuing such relief herein. *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (ordering the president to perform ministerial duty, "[a]ccordingly, we confine ourselves at this time to a declaration of the law, that is, that the President has a constitutional duty forthwith to grant, effective as of October, 1972, the federal pay increase mandated by the Congress and sought by NTEU herein so that the members of NTEU can collect what has been due them for many months."); *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 225 (D.D.C. 2020) (acknowledging it may be correct that "[n]o Circuit precedent bars the issuance of a declaratory judgment in an action against the President"); c*f. Nat'l Wildlife Fed'n v. U.S.*, 626 F.2d 917, 923 (D.C. Cir. 1980) (declining to award declaratory relief against president and OMB director where there was no evidence that they had failed to comply with requirements of Forest Rangeland Renewable Resources Planning Act in proposing fiscal budget to Congress).

Board member, *id*. Thus, it concluded that Swan, being permitted to resume his seat on the Board in a "de facto fashion" was an "adequate remedy." *Id.* at 979–80.

Courts in this Circuit have consistently followed *Swan*. In *Severino v. Biden*, the D.C. Circuit ruled that the plaintiff there, a Council member, who had been presidentially appointed to the Council of the Administrative Conference of the United States and later removed, could seek an injunction against a subordinate agency official. 71 F.4th at 1043. Relying on *Swan*, the court made clear "[o]ur power to enjoin the Conference's Chairperson is undisputed, and, at least in principle, the Chairperson may 'includ[e] [Severino] in Board meetings,' 'giv[e] him access to his former office,' and permit him to cast votes as if he were a Council member, just the same forms of relief we held sufficient in *Swan*." *Id.* (*quoting Swan*, 100 F.3d at 980). In *Spicer v. Biden*, the court similarly applied *Swan* concluding that the plaintiffs, members of the Board of Visitors to the United States Naval Academy, who challenged President Biden's decision to remove them from their positions, could seek an injunction against subordinate officials to treat them as present Board members. 575 F. Supp. 3d 93, 97 (D.D.C. 2021). While the plaintiffs in *Swan*, *Spicer*, and *Severino* ultimately failed to obtain injunctive relief—because the respective courts ruled on the merits that the enabling statutes imposed no removal restrictions on the President—these cases are still instructive vis-à-vis the court's power to issue injunctive relief in these types of cases.

There is no question that *Swan* and *Severino* control here. As in *Swan*, Plaintiff here seeks injunctive relief from Defendant Kiko, a subordinate official, to treat her as a de facto member of the FLRA. Compl. Prayer for Relief (ECF No. 1). Defendant Kiko may provide Plaintiff access to her office, treat her as a regular member of the Authority, permit her to vote, record her votes as official, and let her draw a salary. In a footnote, Defendants give short shrift to *Swan*, Defs.' Br. 15 fn.4, because the case involved the plaintiff's standing to challenge a removal. But the

redressability prong of Article III addresses whether a court has the power to redress a plaintiff's injury by fashioning a remedy. In *Swan*, the court provided in depth analysis as to why it had the power to issue injunctive relief against subordinate officers and why that relief could adequately remedy the plaintiff's injuries.

Granting the injunction Plaintiff seeks here is well within this Court's discretion. Courts possess "flexibility and discretion" "to tailor equitable remedies" and it is certainly not incumbent upon "judges to eradicate all vestiges of an injury in awarding equitable relief." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1970) ("[T]he scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").[4] Exercising these equitable powers, courts in recent cases involving similar issues, have granted injunctions to members of independent agencies who were unlawfully removed from their positions by the President without cause. *See Harris*, 2025 WL 521025, at *3; *Dellinger v. Bessent*, 2025 WL 471022, at *14 (D.D.C. Feb. 12, 2025).

## III. PLAINTIFF HAS SUFFERED IRREPARABLE HARM, AND INJUNCTIVE RELIEF IS THE ONLY ADEQUATE REMEDY.

Defendants also take issue with the irreparable harm Plaintiff continues to suffer. Defendants first argue that Plaintiff's harm—loss of income, face, and reputation, and deprivation of a high-level position—does not amount to the "genuinely extraordinary situation" required to

---

[4] Defendants invoke historical cases that, according to them, circumscribe the court's equitable powers with respect to removal and appointment. But their main case, *In re Sawyer*, involved a district court's attempt to restrain local city officials from removing a police judge from office. 124 U.S. 200, 212 (1888). The Court there did not sanction a lower federal district court's attempt to interfere in state affairs, concluding that injunctive relief in this instance was not appropriate. *Id.* at 221. On that note, Justice Field, in concurrence wrote "[o]n no subject is the independence of the authorities of the state, and of her municipal bodies, from federal interference in any form, more complete than in the appointment and removal of their officers." *Id.* at 222 (Field. J., concurring).

meet the requisite showing harm. Defs.' Br. 17; *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). But for all the reasons stated in her opening brief, Pls'. Mot. for Prelim Inj. (ECF No. 4), Plaintiff's harm is far more than just a grievance over pay or personnel issues. As previously explained, Plaintiff was appointed to and confirmed as a member of an agency charged with exercising a degree of independence from the President. As a member of such an agency, her duty to fulfill her statutory obligations is as much in her own interest as it is in the FLRA's. Her removal has deprived her of her statutory right to function in her office, and a deprivation of that statutory right has caused immeasurable damage to the FLRA, especially with the unprecedented changes to the federal workforce. Thus, not one of the "routine cases" Defendants cite, in which employees in apparently "high-level positions" were terminated, are applicable here. Defs.' Br. 17–18.

Next, Defendants claim that Plaintiffs' reliance on *Berry v. Reagan*, Civ. A. No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983), is unavailing, because the Commission at issue in *Berry* could not function without a quorum, while the FLRA still has a quorum even without Plaintiff. Defs.' Br. 18. But that overlooks the harm that the *Berry* court broadly identified—deprivation of the "statutory right to function as Commissioners." *Id.* at 5. In *Berry*, there was no enabling, for-cause statute that expressly limited the president's removal vis-à-vis members of the Commission. *Id.* at 3–4. But the court, relying on the purpose behind the creation of the Commission and its legislative history, concluded that Congress had intended to limit the president's removal powers, in part because the Commission had a sunset provision before which it had to wind-up and complete a final report. *Id.* at 5. On the facts of the case, therefore, the court found that a "quorum" was needed for the Commission to finish its work. *Id.* The court did not conclude, as Defendants claim, that the "statutory right to function" necessarily meant a lack of a "quorum."

The court in *Harris v. Bessent*, recently rejected this same argument Defendants raise here—that plaintiff Harris had not suffered irreparable harm because the Merits Service Protection Board could still function without a quorum. 2025 WL 521027, at *6. The court explained that the focus of the irreparable harm inquiry was whether the President's actions removing a member of an independent agency compromised the independence of the agency:

> With this in mind, the irreparable harm in this case becomes clear. Were the President able to displace independent agency heads from their positions for the length of litigation such as this, those officials' independence would shatter. *See* Pl.'s Mot. at 10 ("Simply put, Congress reasonably concluded that the MSPB cannot serve as an independent protector of a merit system if the Members are subject at all times to removal without cause by the President."); Pl.'s Reply at 7, ECF No. 7 ("Allowing Ms. Harris's illegal termination to stand for even a short period would violate the bipartisan, independent nature of the Board."). . . the MSPB's congressionally mandated independence would be permanently marred by the threat of renewed removal and delayed reinstatement while litigation proceeds. *See Humphrey's Executor*, 295 U.S. at 629–30, 55 S. Ct. 869 (explaining that the "coercive influence" of the removal power "threatens the independence of a commission").

*Id.* at *8. That same logic applies here. Plaintiff Grundmann's unlawful removal has caused her to face irreparable harm both in her personal and official capacities because her removal frustrates the bipartisan, independent nature of the FLRA and deprives her of her ability to carry out her statutory functions. Pl.'s Mot. for Prelim Inj. 12–14 (ECF No. 4).

Finally, Defendants charge that Plaintiff is not harmed by the FLRA's inability to carry out its work in an efficient manner, and thus Plaintiff "lacks Article III standing to obtain relief based on the interests of the FLRA or regulated parties." Defs.' Br. 19. This seems to conflate several issues. Plaintiff does not necessarily assert the FLRA interests are her own. Rather, as discussed at length, as a member of an independent agency, the harm stemming from Plaintiff's inability to perform her statutory duties *is one in the same* as the harm to the FLRA. This view finds support in the case law. *Harris*, 2021 WL 521027, at *7 ("By vindicating their rights to occupy those

offices, these plaintiffs act as much in their own interests as those of their agencies'."); *Humphrey's Executor*, 295 U.S. at 625 ("For it is quite evident that one who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will."); *Wiener v. United States*, 357 U.S. 349, 353 (1958) (same).

Plaintiff has no adequate remedy at law— she has not alleged an injury in the form of loss of income or damage to her reputation. Indeed, no amount of damages could remedy her deprivation. Thus Plaintiff Grundmann's abrupt removal which deprived her ability to perform her statutory obligations constitutes a strong showing of irreparable harm for which only injunctive relief is the proper remedy.

## IV. THE BALANCING OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH IN FAVOR OF PLAINTIFF.

In Defendants final argument on pages 19–21, they incorrectly tip the balance of harms and equities against Plaintiff Grundmann. "Because the FLRA is an executive agency exercising executive authority," Defendants argue, "an injunction functionally reinstating one of its principal officers would raise grave separation-of-powers concerns and work a great and irreparable harm to the Executive." Defs.' Br. 19. But that is true only if the Defendants are correct that the President had the authority to remove Plaintiff Grundmann in the first place. The government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015).  In that regard, the balance favors Grundmann.

On the other side of the scale, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). So, too, there is a substantial public interest in upholding the protections from removal that Congress has given to certain members of

18

independent agencies. Because "federal law limits the conditions under which [Ms. Grundmann's] tenure may be terminated, Supreme Court precedent supports the constitutionality of those conditions, and Defendants do not argue that those conditions were met here, . . . it is in the public interest to issue injunctive relief." *Harris*, 2025 WL 521027, at *9. However, the Statute also makes clear that Members "may be removed by the President only upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office." *Id.* This protection against removal is **necessary** to permit the Authority's Members to preside over matters involving executive branch agencies without fear of reprisal for their decisions.

Indeed, in enacting the Statute, Congress specifically recognized how the Authority "safeguards the public interest," "contributes to the effective conduct of public business," and "facilitates and encourages the amicable settlements of disputes between employees and their employers involving conditions of employment." 5 U.S.C. § 7101(a)(1); *see also id.* § 7101(a)(2) ("[L]abor organizations and collective bargaining in the civil service are in the public interest" and "the public interest demands . . . the efficient accomplishment of the operations of the Government.") It follows, therefore, that a fully staffed three-Member bi-partisan Authority is in the public interest, since it prevents cases from being held in abeyance due to a 1:1 deadlock between Authority Members of opposite political parties, as Congress acknowledged when it enacted the Statute. This factor too favors Grundmann.

As explained in Plaintiff Grundmann's opening brief (at 14–15) and her Declaration, when there are only two Members on the Authority and they are of opposing political parties—as the Authority would be without Grundmann—where the two Members disagree, cases go "into abeyance pending the arrival of a third Member to break the tie." Grundman Decl. at ¶ 7. Abeyance contravenes the Statute's design, which recognizes the importance of decisions being issued timely,

so as not to create undue delay and inefficiency in government activities. Abeyance also is "time and resource consuming and potentially delays when and whether agencies can implement certain changes in working conditions." *Id.* at ¶ 8. Abeyance unquestionably "results in increased costs and confusion to the parties" and adds "to the bottom line of agencies, the cost of which is ultimately borne by taxpayers." *Id.* at ¶ 10. Holding cases in abeyance can slow down resolution, leaving federal agencies and unions in limbo, adversely affecting workplace policies, contract negotiations, and disciplinary actions, not to mention decisions on unfair labor practices or arbitration appeals directing impacting federal employees' rights, pay and working conditions. It also creates legal uncertainty and likely inconsistency in labor practices the longer key labor issues remain unresolved.

Now more than ever, our agencies need an Authority with a full complement of properly appointed Members. Just last week, in *National Treasury Employees' Union v. Trump*, this Court held that it had no jurisdiction to hear challenges to three of the President Trump's recent executive actions aimed at drastically reducing the size of the federal workforce. Case No. 25-cv-420 (CRC), 2025 WL 561080, at *8 (D.D.C. Feb. 20, 2025). In so holding, the Court made clear that it was the **Authority** that had to hear these challenges as a preliminary matter. *Id.* In so holding, the Court re-acknowledged the Authority's quasi-judicial function and expertise. A deadlocked Authority, however, will not be able to issue any definitive ruling due to cases being held in abeyance, leaving those parties without recourse or a meaningful process in which to advance their concerns. This also favors an injunction reinstating Grundmann.

This very real harm "strongly favors" an injunction in this case. *Berry*, 1983 WL 538, at *6. Against this backdrop, the public interest and balance of harms and equities clearly lie in favor of the Court promptly restoring Plaintiff Grundmann to her Member role on the Authority, from

which she was wrongfully removed, **before** her term is scheduled to expire, **before** a successor has been appointed and confirmed to take her place, **and without** notice, cause or a hearing. Defendants' actions amount to a blatant disregard of the Statute that established the Authority and governs its operations.  This cannot be permitted, and an injunction is the only remedy available to address this wrong. Defendants cannot rightfully object to "an injunction that merely ends an unlawful practice or reads a statute as required."  *R.I.L.-R*, 80 F. Supp. 3d at 191.

This is not to say that the President cannot influence the FLRA. Because the Authority's Members serve staggered terms, no more than two of whom can be of the same political party, every president has the "opportunity to shape its leadership and thereby influence its activities." *Seila Law*, 591 U.S. at 225. For all of these reasons, the public interest and the balance of harms and equities strongly weigh in favor of Plaintiff Grundmann.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Plaintiff Susan Tsui Grundmann respectfully requests that this Court grant her Motion for Summary Judgment and deny Defendants' Cross-Motion for Summary Judgment. Plaintiff also requests this Court enter an Order: (1) declaring that the act of removing Plaintiff Grundmann from the Federal Labor Relations Authority is *void ab initio* under 5 U.S.C.§ 7104 and (2) enjoining Defendant Kiko from precluding Plaintiff from carrying out her statutory duties as Member of the Authority and restoring immediately all powers and privileges of such appointment.


Dated: February 28, 2025                    Respectfully submitted,


                                            */s/*   Jon M. Greenbaum
                                            Norman L. Eisen, D.C. Bar #435051
                                            Tianna J. Mays, D.C. Bar #90005882 (pro hac
                                            forthcoming)
                                            Jon M. Greenbaum, D.C. Bar #489887
                                            Pooja Chaudhuri, D.C. Bar #888314523
                                            STATE DEMOCRACY DEFENDERS FUND
                                            600 Pennsylvania Avenue SE #15180
                                            Washington, DC 20003
                                            Tel: (202) 601-8678
                                            norman@statedemocracydefenders.org
                                            tianna@statedemocracydefenders.org
                                            jgreenbaum@justicels.com
                                            pooja@statedemocracydefenders.org