APPEAL,CLOSED,TYPE–D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:25–cv–00425–SLS</u>
### *Internal Use Only*

GRUNDMANN v. TRUMP et al
Assigned to: Judge Sparkle L. Sooknanan
Cause: 28:2201 Injunction

Date Filed: 02/13/2025
Date Terminated: 03/12/2025
Jury Demand: None
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: U.S. Government Defendant

**<u>Plaintiff</u>**

**SUSAN TSUI GRUNDMANN**                 represented by    **Norman Larry Eisen**
NORMAN EISEN PLLC
2022 Columbia Road NW
# 214
Washington, DC 20009–1309
202–753–9667
Email: norman@statedemocracydefenders.org
*ATTORNEY TO BE NOTICED*

**Pooja Chaudhuri**
STATE DEMOCRACY DEFENDERS
FUND
District of Columbia
600 Pennsylvania Ave SE
Unit 15180
Washington, DC 20003
202–594–9958
Email: pooja@statedemocracydefenders.org
*ATTORNEY TO BE NOTICED*

**Jon M. Greenbaum**
JUSTICE LEGAL STRATEGIES PLLC
P.O. Box 27015
Washington, DC 20038–7015
202–601–8678
Email: jgreenbaum@justicels.com
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**DONALD J. TRUMP**                       represented by    **Alexander William Resar**
*in his official capacity as President*                     DOJ–CIV
1100 L Street NW
Suite 11208

1

Washington, DC 20530
(202) 616–8188
Fax: (202) 616–8470
Email: alexander.w.resar@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**COLLEEN DUFFY KIKO**                    represented by  **Alexander William Resar**
*in her official capacity as chairman of*                    (See above for address)
*the Federal Labor Relations Authority*                    *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/13/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC–11478947) filed by SUSAN TSUI GRUNDMANN. (Attachments: # 1 Exhibit Exhibit A, # 2 Civil Cover Sheet Civil Cover Sheet and Addendum, # 3 Summons Defendant Trump Summons, # 4 Summons Defendant Kiko Summons)(Greenbaum, Jon) (Entered: 02/13/2025) |
| 02/13/2025 |  | RESOLVED.....NOTICE OF NEW CASE ERROR The following error(s) need correction: Attorney is not an Active bar member. Please refer to the court website for Bar Status Lookup, Attorney Admissions, and Renewal Information at www.dcd.uscourts.gov/attorneys. (zmtm) Modified on 2/14/2025 (zhcn). (Entered: 02/13/2025) |
| 02/14/2025 |  | Case Assigned to Judge Sparkle L. Sooknanan. (zmtm) (Entered: 02/14/2025) |
| 02/14/2025 | 2 | SUMMONS (2) Issued Electronically as to COLLEEN DUFFY KIKO, DONALD J. TRUMP. (Attachments: # 1 Notice and Consent)(zmtm) (Entered: 02/14/2025) |
| 02/14/2025 |  | NOTICE OF NEW CASE ERROR The following error(s) need correction: Missing summonses– U.S. government. When naming a U.S. government agent or agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit using the event Request for Summons to Issue. (zmtm) (Entered: 02/14/2025) |
| 02/14/2025 | 3 | REQUEST FOR SUMMONS TO ISSUE filed by SUSAN TSUI GRUNDMANN. (Attachments: # 1 Summons USAO)(Greenbaum, Jon) (Entered: 02/14/2025) |
| 02/14/2025 | 4 | MOTION for Preliminary Injunction *and Combined*, MOTION for Summary Judgment by SUSAN TSUI GRUNDMANN. (Attachments: # 1 Memorandum in Support, # 2 Declaration Declaration and Exhibit A, # 3 Statement of Facts, # 4 Text of Proposed Order)(Greenbaum, Jon) (Entered: 02/14/2025) |
| 02/15/2025 |  | MINUTE ORDER. After review of the Plaintiff's 1 Complaint and 4 Motion for Preliminary Injunction and Summary Judgment, the Court ORDERS the Parties to meet, confer, and file a Joint Status Report addressing the following issues by 11:00 AM on Monday February 17, 2025: (1) a proposed briefing schedule for Plaintiff's 4 Motion; (2) a statement addressing whether a hearing on the Motion is necessary, and if so, two proposed dates and times for such a hearing; and (3) a statement addressing whether the Parties anticipate factual disputes between declarants, and if so, a |

| | | |
|---|---|---|
| | | statement addressing whether the Parties believe an evidentiary hearing will be necessary to resolve the disputes and a proposal for proceeding with such a hearing, see LCvR 65.1(d). The Parties may also address any other issues that they believe will be helpful to the Court. Any disagreements should be noted in the Joint Status Report. Signed by Judge Sparkle L. Sooknanan on 2/15/2025. (lcrk) (Entered: 02/15/2025) |
| 02/16/2025 | 5 | NOTICE of Appearance by Jon M. Greenbaum on behalf of All Plaintiffs (Greenbaum, Jon) (Entered: 02/16/2025) |
| 02/16/2025 | 6 | NOTICE of Appearance by Pooja Chaudhuri on behalf of SUSAN TSUI GRUNDMANN (Chaudhuri, Pooja) (Entered: 02/16/2025) |
| 02/16/2025 | 7 | NOTICE of Appearance by Norman Larry Eisen on behalf of All Plaintiffs (Eisen, Norman) (Entered: 02/16/2025) |
| 02/17/2025 | 8 | Joint STATUS REPORT by DONALD J. TRUMP, COLLEEN DUFFY KIKO, SUSAN TSUI GRUNDMANN. (Greenbaum, Jon) (Entered: 02/17/2025) |
| 02/17/2025 | | MINUTE ORDER: In light of the Parties' 8 Joint Status Report, the Court ORDERS the Parties to comply with the following briefing schedule: 1) The Defendants shall file their opposition and cross–motion by February 25, 2025. 2) The Plaintiff shall file her reply and opposition to the cross–motion by February 28, 2025. 3) The Defendants shall file their reply in support of the cross–motion by March 5, 2025. 4) Any hearing, if necessary, will be held in person on March 7, 2025, at 11:00 AM in Courtroom 14. Signed by Judge Sparkle L. Sooknanan on 2/17/2025. (lcrk) (Entered: 02/17/2025) |
| 02/19/2025 | 9 | SUMMONS (2) Issued Electronically as to U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(zjm) (Entered: 02/19/2025) |
| 02/25/2025 | 10 | NOTICE of Appearance by Alexander William Resar on behalf of All Defendants (Resar, Alexander) (Entered: 02/25/2025) |
| 02/25/2025 | 11 | Cross MOTION for Summary Judgment by DONALD J. TRUMP, COLLEEN DUFFY KIKO. (Attachments: # 1 Memorandum in Support of Defendants' Cross Motion for Summary Judgment, # 2 Defendants' Statement of Undisputed Material Facts and Response to Plaintiffs' Statement of Material Facts, # 3 Proposed Order)(Resar, Alexander) (Entered: 02/25/2025) |
| 02/25/2025 | 12 | Memorandum in opposition to re 4 Motion for Preliminary Injunction,, Motion for Summary Judgment, filed by DONALD J. TRUMP, COLLEEN DUFFY KIKO. (Resar, Alexander) (Entered: 02/25/2025) |
| 02/28/2025 | 13 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DONALD J. TRUMP served on 2/26/2025 (Attachments: # 1 Exhibit Certified Mail Receipt)(Greenbaum, Jon) (Entered: 02/28/2025) |
| 02/28/2025 | 14 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. COLLEEN DUFFY KIKO served on 2/21/2025 (Attachments: # 1 Exhibit Certified Mail Receipt)(Greenbaum, Jon) (Entered: 02/28/2025) |
| 02/28/2025 | 15 | Memorandum in opposition to re 11 Motion for Summary Judgment, filed by SUSAN TSUI GRUNDMANN. (Greenbaum, Jon) (Entered: 02/28/2025) |
| 02/28/2025 | 16 | REPLY to opposition to motion re 4 Motion for Preliminary Injunction,, Motion for Summary Judgment, filed by SUSAN TSUI GRUNDMANN. (Greenbaum, Jon) (Entered: 02/28/2025) |

| 03/03/2025 | | NOTICE of Hearing: The parties shall appear for a Motion Hearing scheduled for March 7, 2025 at 11:00 AM in Courtroom 14 (in person) before Judge Sparkle L. Sooknanan. (lsj) (Entered: 03/03/2025) |
|---|---|---|
| 03/04/2025 | 17 | NOTICE OF SUPPLEMENTAL AUTHORITY by SUSAN TSUI GRUNDMANN (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Greenbaum, Jon) (Entered: 03/04/2025) |
| 03/05/2025 | 18 | REPLY to opposition to motion re 11 Motion for Summary Judgment, filed by DONALD J. TRUMP, COLLEEN DUFFY KIKO. (Resar, Alexander) (Entered: 03/05/2025) |
| 03/06/2025 | 19 | NOTICE OF SUPPLEMENTAL AUTHORITY by DONALD J. TRUMP, COLLEEN DUFFY KIKO (Attachments: # 1 Exhibit A – Order, Dellinger v. Bessent, No. 25–5052 (D.C. Cir. Mar. 5, 2025))(Resar, Alexander) (Entered: 03/06/2025) |
| 03/06/2025 | 20 | NOTICE OF SUPPLEMENTAL AUTHORITY by SUSAN TSUI GRUNDMANN (Attachments: # 1 Exhibit A)(Greenbaum, Jon) (Entered: 03/06/2025) |
| 03/07/2025 | | Minute Entry for Motion Hearing held before Judge Sparkle L. Sooknanan on 3/7/2025. Oral arguments submitted on Plaintiff's Motion 4 for Preliminary Injunction and Summary Judgment and Defendants' Cross Motion 11 for Summary Judgment. Motions taken under advisement; forthcoming Order. (Court Reporter: Janice Dickman) (lsj) (Entered: 03/07/2025) |
| 03/12/2025 | 21 | ORDER: The Plaintiff's Motion 4 for Summary Judgment is GRANTED; and the Defendants' Cross–Motion 11 for Summary Judgment is DENIED. See Order for details. Signed by Judge Sparkle L. Sooknanan on 3/12/2025. (lsj) (Entered: 03/12/2025) |
| 03/12/2025 | 22 | MEMORANDUM AND OPINION. For the reasons stated, the Court grants the Plaintiff's Motion 4 for Summary Judgment and denies the Defendants' Cross–Motion 11 for Summary Judgment. Signed by Judge Sparkle L. Sooknanan on 3/12/2025. (lsj) (Entered: 03/12/2025) |
| 03/14/2025 | 23 | TRANSCRIPT OF PROCEEDINGS before Judge Sparkle L. Sooknanan held on March 7, 2025; Page Numbers: 1–54. Date of Issuance: March 14, 2025. Court Reporter: Janice Dickman, Telephone number: 202–354–3267, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/4/2025. Redacted Transcript Deadline set for 4/14/2025. Release of Transcript Restriction set for 6/12/2025.(Dickman, Janice) (Entered: 03/14/2025) |

| 05/08/2025 | 24 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 21 Order on Motion for Preliminary Injunction, Order on Motion for Summary Judgment, 22 Memorandum & Opinion by DONALD J. TRUMP, COLLEEN DUFFY KIKO. Fee Status: No Fee Paid. Parties have been notified. (Resar, Alexander) (Entered: 05/08/2025) |
|---|---|---|

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SUSAN TSUI GRUNDMANN,

*Plaintiff*,

*v.*

DONALD J. TRUMP, in his official
capacity as President of the United States,                    Civil Action No. 1:25-cv-425-SLS

          and

COLLEEN DUFFY KIKO, in her official
capacity as Chairman of the Federal Labor
Relations Authority,

*Defendants*.

<u>**DEFENDANTS' NOTICE OF APPEAL**</u>

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of
Appeals for the District of Columbia Circuit the Court's March 12, 2025 Order, *see* ECF No. 21,
and Memorandum Opinion, *see* ECF No. 22.

Dated: May 8, 2025                    Respectfully submitted,


                                      YAAKOV M. ROTH
                                      *Acting Assistant Attorney General*

                                      CHRISTOPHER R. HALL
                                      *Assistant Branch Director*

                                      /s/ *Alexander W. Resar*
                                      ALEXANDER W. RESAR
                                      *Trial Attorney*
                                      U.S. Department of Justice
                                      Civil Division, Federal Programs Branch
                                      1100 L Street, NW
                                      Washington, DC 20530
                                      Telephone: (202) 616-8188
                                      Email: alexander.w.resar@usdoj.gov

                                      *Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUSAN TSUI GRUNDMANN,

*Plaintiff*,

v.

DONALD J. TRUMP, *et al.*,

*Defendants.*

Civil Action No. 25-425 (SLS)

Judge Sparkle L. Sooknanan

## <u>ORDER</u>

Upon consideration of the Plaintiff's Motion for Summary Judgment, ECF No. 4, the Defendants' Cross-Motion for Summary Judgment, ECF No. 11, the legal memoranda in support and in opposition, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby:

**ORDERED** that the Plaintiff's Motion for Summary Judgment, ECF No. 4, is **GRANTED**; and the Defendants' Cross-Motion for Summary Judgment, ECF No. 11, is **DENIED**. It is further

**DECLARED** that the termination of the Plaintiff Susan Tsui Grundmann was unlawful, in violation of the Federal Service Labor-Management Relations Statute, 5 U.S.C. § 7104(b). Ms. Grundmann remains a Member of the Federal Labor Relations Authority, having been appointed by the President, and confirmed by the Senate to a five-year term on May 12, 2022, and she may be removed by the President prior to the expiration of her term "only upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office," pursuant to 5 U.S.C. § 7104(b). It is further

**ORDERED** that the Plaintiff Susan Tsui Grundmann shall continue to serve as a Member of the Federal Labor Relations Authority (FLRA) until her term expires pursuant to 5 U.S.C. § 7104(c), unless she is earlier removed "upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office," *id.* § 7104(b). The Defendant Colleen Duffy Kiko, as well as her subordinates, agents, and employees, are **ENJOINED** from removing Ms. Grundmann from her office without cause or in any way treating Ms. Grundmann as having been removed, from impeding in any way her ability to fulfill her duties as a Member of the FLRA, and from denying or obstructing her authority or access to any benefits or resources of the office; it is further

**ORDERED** that the Defendant Colleen Duffy Kiko and her subordinates, agents, and employees provide the Plaintiff Susan Tsui Grundmann with access to the necessary government facilities and equipment so that she may carry out her duties during her term as a Member of the Federal Labor Relations Authority; and it is further

**ORDERED** that the Clerk of the Court close this case.

This is a final appealable order.

**SO ORDERED.**

                                         _____

                                         SPARKLE L. SOOKNANAN
                                         United States District Judge

Date: March 12, 2025

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SUSAN TSUI GRUNDMANN, | |
| *Plaintiff*, | |
| v. | Civil Action No. 25‑425 (SLS) |
| DONALD J. TRUMP, *et al.*, | Judge Sparkle L. Sooknanan |
| *Defendants*. | |

## <u>MEMORANDUM OPINION</u>

The Constitution vests Congress with broad authority to organize the Executive Branch. U.S. Const. art. I, §§ 1, 8. From its earliest days, Congress exercised this power by creating institutions to structure the government. And for almost a century and a half, Congress has created independent federal agencies with specific expertise and limited the President's power to remove principal officers leading those agencies. The Supreme Court first blessed that approach in 1935 when it rejected the President's claim of "illimitable power of removal" over all federal officers, *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629 (1935), instead holding that our Constitution gives Congress the power to "create expert agencies led by a group of principal officers removable by the President only for good cause." *Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020) (emphasis omitted) (citing *Humphrey's Ex'r*, 295 U.S. 602). And the Supreme Court has repeatedly endorsed statutory removal protections for multimember and bipartisan expert agencies since then.

Congress created the Federal Labor Relations Authority (FLRA) to impartially manage and resolve disputes surrounding labor organization in the federal workforce. The independence of the

FLRA was central to its creation, as Congress wanted to ensure a fair, consistent, and unbiased process for managing federal labor relations that would not shift with political whims. To achieve this goal, Congress decided to give the three Members of the FLRA a limited statutory protection from removal by the President. They could be removed only for inefficiency, neglect of duty, or malfeasance in office during their staggered five-year terms, and only after notice and a hearing.

In the nearly fifty years since the FLRA's creation, no President has ever removed a Member. Until now. On February 10, 2025, the Plaintiff, Susan Tsui Grundmann, received a two-sentence email on behalf of President Donald J. Trump informing her that her position on the FLRA had been terminated. Ms. Grundmann received no explanation whatsoever for her termination. And she did not receive notice or a hearing. Ms. Grundmann is not alone. This is one of a series of cases filed in this District challenging the President's unprecedented removal of officers across the federal government without cause, including Members of the Merit Systems Protection Board and the National Labor Relations Board, as well as the Special Counsel.

The Government vigorously defends Ms. Grundmann's hasty termination on the basis that the Constitution vests the entirety of the "executive Power" in the President. U.S. Const. art. II, § 1, cl. 1. It argues that the President may remove federal officials on a whim, and in doing so, override Congress's considered judgment. The Government's arguments paint with a broad brush and threaten to upend fundamental protections in our Constitution. But ours is not an autocracy; it is a system of checks and balances. Our Founders recognized that the concentration of power in one branch of government would spell disaster. "The doctrine of the separation of powers was adopted by the convention of 1787 not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was not to avoid friction, but, by means of the inevitable friction

incident to the distribution of the governmental powers among three departments, to save the people from autocracy." *Myers v. United States*, 272 U.S. 52, 293 (1926) (Brandeis, J., dissenting).

The removal in this case was unlawful. The Government concedes that Ms. Grundmann's removal violated the FLRA's founding statute—a statute that Congress enacted and the President signed into law to revamp federal labor relations in the federal government. The Government's argument that the statutory removal provision is unconstitutional cannot be reconciled with longstanding Supreme Court precedent that is binding on this Court. And it would encroach on Congress's authority under Article I of the Constitution.[1]

As for remedies, the Government takes the position that this Court lacks the authority to provide meaningful relief in these circumstances. It argues that where a President removes a Senate-confirmed federal officer in violation of a duly enacted and constitutional statute, the only recourse is an award of backpay to that officer. Why? According to the Government, any order from this Court that results in the officer continuing her role against the President's will would raise grave separation-of-powers concerns. In other words, where a President exceeds his power under Article II of the Constitution and intrudes on Congress's Article I authority, the Government's position is that an Article III court may not interpret the law and redress the resulting injury. It is the Government's own argument that raises grave separation-of-powers concerns. There can be no doubt that "the President is bound to abide by the requirements of duly enacted and otherwise constitutional statutes." *Swan v. Clinton*, 100 F.3d. 973, 977 (D.C. Cir. 1996). And it is precisely the role of an Article III court to step in when that does not

---

[1] The Government has hinted that it intends to ask the Supreme Court to overrule its precedent, invalidating statutory provisions that have been in place for nearly a century and a half and leaving the President free to fire whomever he wants in the Executive Branch. *See* Letter from Sarah Harris, Acting Solicitor General, to Sen. Richard Durbin on Restrictions on the Removal of Certain Principal Officers of the United States (Feb. 12, 2025), https://perma.cc/D67G-FKK4.

happen. Ms. Grundmann is entitled to relief that would redress her injury and allow her to continue her work on the FLRA.

For those reasons and the reasons that follow, the Court grants Ms. Grundmann's Motion for Summary Judgment and denies the Defendants' Cross-Motion for Summary Judgment.

## BACKGROUND

### A.    Statutory Background

Nearly fifty years ago, Congress enacted the Federal Service Labor-Management Relations Statute (FSLMRS), 5 U.S.C. §§ 7101–7135, as part of the Civil Service Reform Act (CSRA), Pub. L. No. 95-454, 92 Stat. 1111 (1978). These statutes "comprehensively reorganized the structure of labor-management relations in the federal government." *Library of Cong. v. FLRA*, 699 F.2d 1280, 1283 (D.C. Cir. 1983). "Congress intended the new statutory system to serve the twin goals of protecting the right of public employees to organize and bargain collectively, while simultaneously strengthening the authority of federal management to hire and fire employees in the interest of a more effective public service." *Id.* (citing 5 U.S.C. § 7101).

Congress created the Federal Labor Relations Authority (FLRA) to "carry[] out the purpose" of the FSLMRS. 5 U.S.C. § 7105(a)(1). It tasked the FLRA with "conduct[ing] hearings and resolv[ing] complaints of unfair labor practices," "resolv[ing] issues relating to the duty to bargain in good faith," and "resolv[ing] exceptions to arbitrator's awards." *Id.* § 7105(a)(2). Congress also empowered the FLRA to supervise elections for the selection of labor organizations by employees and to prescribe certain criteria related to labor bargaining in the federal workforce. *Id.*

The FLRA is composed of three Members, all appointed by the President with the advice and consent of the Senate. *Id.* § 7104. No more than two of the three Members are permitted to

"be adherents of the same political party." *Id.* § 7104(a). And each Member is to serve a staggered five-year term. *See* 5 U.S.C. § 7104(c) (establishing five-year terms); CSRA, Pub. L. No. 95-454, § 7104(c)(1), 92 Stat. 1196 (1978) (staggering terms). The Members can be removed by the President "only upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 7104(b). But the President has the authority to designate one of the Members as the "Chairman of the Authority." *Id.*

The structure of the FLRA was meant to ensure "the resolution of disputes by the intervention of neutral, independent, third parties[.]" 124 Cong. Rec. 25,720 (1978). Congress sought to "eliminate what [was] perceived by Federal employee unions and others as conflict of interest in the existing council," H.R. Rep. No. 95-1717, at 159 (1978), and to create a body that was "impartial by independence from any direct responsibility to the incumbent administration," S Rep. No. 95-969, at 7 (1978). As one sponsor stated:

> One of the central elements of a fair labor relations program is effective, impartial administration. Title VII provides for the creation of an independent and neutral Federal labor relations authority to administer the Federal labor-management program . . . . Currently the Federal labor-management program is administered by the Federal Labor Relations Council which is composed of three administration officials, . . . none of whom can be considered neutral.

124 Cong. Rec. 25,721 (1978). The belief was that "[i]mpartiality [was] guaranteed by protecting authority members from unwarranted 'Saturday night' removals." *Id.* at 25,721–25,722.

### B.    Factual Background

The facts are drawn from the Plaintiff's Complaint and Statement of Material Facts, which the Defendants do not dispute. Joint Status Report at 3, ECF No. 8.

The Plaintiff, Susan Tsui Grundmann, became a Member of the FLRA on May 12, 2022. Compl. ¶ 3, ECF No. 1. She was appointed by President Joseph R. Biden and confirmed by the Senate to a term set to expire on July 1, 2025. *Id.* But that expiration date was not set in stone.

Under the FSLMRS, she was permitted to continue serving until either her successor took office or the last day of the Congress beginning after the original expiration date, 5 U.S.C. § 7104(c), which in her case would fall in January 2029, Compl. ¶ 3. On January 3, 2023, President Biden designated her as Chairman of the Authority. Pl.'s Mot. for Summ. J. & Prelim. Inj. ("Pl.'s Mot.") at 1, ECF No. 4; Defs.' Opp'n to Pl.'s Mot. for Summ. J. ("Defs.' Opp'n") at 5, ECF No. 12.

The Government does not allege that Ms. Grundmann has been an ineffective Member of the FLRA. Yet on February 10, 2025, at 10:46 PM, Ms. Grundmann received a two-sentence email from Trent Morse, the Deputy Director of the White House Office of Presidential Personnel: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Federal Labor Relations Authority is terminated, effective immediately. Thank you for your service." Pl.'s Decl. in Supp. of Pl.'s Mot. for Summ. J. & Prelim. Inj. ("Pl.'s Decl.") ¶ 3, ECF No. 4-2. She did not receive notice or a hearing, nor was any "inefficiency, neglect of duty, or malfeasance in office" identified. Compl. ¶ 17. And she has since been unable to perform her duties as a Member of the FLRA. *Id.* ¶ 20. To the best of Ms. Grundmann's knowledge, this is the first time a President has ever removed a Member of the FLRA without cause. Pl.'s Decl. ¶ 12.

On February 11, 2025, President Trump named Colleen Duffy Kiko as Chairman, Compl. ¶ 19, leaving the FLRA with only two Members, *see id.* ¶ 20. Although the FLRA maintains a quorum, without Ms. Grundmann's tiebreaking vote, certain cases may deadlock and go into abeyance. *See* Pl.'s Decl. ¶ 7. This is exactly what happened when Ms. Grundmann served as one of only two Members of the FLRA for eighteen months, resulting in about one-third of the cases being deadlocked. *Id.*

6

### C.    Procedural Background

On February 13, 2025, Ms. Grundmann filed a Complaint alleging that her removal without cause violated the FSLMRS. *See* Compl. ¶¶ 22–25. She named President Trump and Ms. Kiko as Defendants, *id.* ¶¶ 4–5, and she requested both declaratory and injunctive relief, Compl., Prayer for Relief, ¶¶ 1–3. The next day, on February 14, 2025, she filed a Motion for Preliminary Injunction and Summary Judgment. *See* Pl.'s Mot. for Summ. J. & Prelim. Inj. ("Pl.'s Mot."). On February 25, 2025, the Defendants filed their Opposition to the Plaintiff's Motion for Summary Judgment, *see* Defs.' Opp'n, and a Cross-Motion for Summary Judgment, *see* Defs.' Cross-Mot. for Summ. J. ("Defs.' Cross-Mot."), ECF No. 11. The Plaintiff responded to both on February 28, 2025. *See* Pl.'s Mem. in Opp'n to Defs.' Cross-Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. 15; Pl.'s Reply in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 16. And the Defendants filed their Reply in support of their Cross-Motion for Summary Judgment on March 5, 2025. *See* Defs. Reply in Supp. of Defs.' Cross-Mot. for Summ. J. ("Defs.' Reply"), ECF No. 18. The Court held a hearing on March 7, 2025. Both motions are now ripe for decision.

### LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The burden is on the movant to make the initial showing of the absence of any genuine issues of material fact." *Ehrman v. United States*, 429 F. Supp. 2d 61, 66 (D.D.C. 2006). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.D.C. Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). When "both

parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman*, 429 F. Supp. 2d. at 67.

## DISCUSSION

The President violated the law when he removed Ms. Grundmann. The removal was in clear contravention of the FSLMRS. And under longstanding Supreme Court precedent, that statute was a valid exercise of Congress's authority under Article I of the Constitution.

### A.    Statutory Violation

The Government concedes that Ms. Grundmann's removal violated the FSLMRS. Motions H'rg (Mar. 7, 2025), Draft Tr. at 24:10–14. The statute provides that "Members of the Authority . . . may be removed by the President only upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 7104(b). But Ms. Grundmann received no notice or hearing. *See* Compl. ¶ 17. And the two-sentence email on behalf of the President informing her of the removal did not allege any inefficiency, neglect of duty, or malfeasance in office. *See id.* The Government instead argues that the removal protection in the FSLMRS is unconstitutional. *See* Defs.' Opp'n at 6–12.

### B.    Constitutionality of the Statute

"[T]he Necessary and Proper Clause grants Congress broad authority to enact federal legislation." *United States v. Comstock*, 560 U.S. 126, 133 (2010). This includes the power to provide removal protections to "multimember bodies with 'quasi-judicial' or 'quasi-legislative' functions." *Seila Law LLC*, 591 U.S. at 217. This power to "create a traditional independent agency headed by a multimember board or commission," *id.* at 207, "cannot well be doubted," *Humphrey's Ex'r*, 295 U.S. at 629. The Court has repeatedly endorsed such removal protections throughout the last century. *See, e.g.*, *id.*; *Wiener v. United States*, 357 U.S. 349 (1958).

8

But this power is not without limits. "Article II provides that '[t]he executive Power shall be vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law*, 591 U.S. at 213 (quoting U.S. Const. art. II, § 1, cl. 1; *id.*, § 3). This establishes a "general rule that the President possesses 'the authority to remove those who assist him in carrying out his duties.'" *Id.* at 215 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513–14 (2010)). The scope of Congress's power therefore turns on whether this general rule applies. *See id.* at 218.

The Supreme Court has identified "two exceptions" that "represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Id.* (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., dissenting)). The first comes from *Humphrey's Executor*, and it extends to "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 591 U.S. at 218. The second comes from *Morrison v. Olson*, 487 U.S. 654 (1988), and it applies to "inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 591 U.S. at 218. Congress may provide removal restrictions to an executive officer who fits within either of these two exceptions. *See id.*

### 1.    The *Humphrey's Executor* Exception

*Seila Law* is best read as teaching that the *Humphrey's Executor* exception applies in two steps. *Seila Law*, 591 U.S. at 218–19. First, courts must ask whether an agency's structure resembles that of the "New Deal-era FTC" described in *Humphrey's Executor*. *Seila Law*, 591 U.S. at 218. Second, courts must ensure that the agency does not exercise substantial executive power. *Id.* at 218–19. If both conditions are met, then Congress has the authority to provide removal restrictions. *Id.* at 218.

9

The Government quibbles with step two. Even though *Seila Law* squarely states that the exception extends to "multimember expert agencies that do not wield *substantial* executive power," *id.* (emphasis added), it argues that the exception is limited to agencies "that exercise *no* executive power," Defs.' Opp'n at 8 (emphasis added). Although some language in *Seila Law* could be read that way, a careful reading of each passage reveals that the opinion is more restrained.

*First*, *Seila Law* outlines its general rule in very broad terms. The Supreme Court says that "the 'executive Power'—all of it—is 'vested in a President.'" *Seila Law*, 591 U.S. at 203 (quoting U.S. Const. art. II, § 1, cl. 1; *id.*, § 3). Then it says that the President has the "power to remove . . . those who wield executive power on his behalf." *Id.* at 204. The combination of these two statements initially suggests that *all* executive power is wielded on behalf of the President, so anyone exercising *any* executive power must be removable at will. *See* Defs.' Opp'n at 7. But the Court immediately acknowledges that there are "two exceptions" to this removal power. *Seila Law*, 591 U.S. at 204. And it would make little sense to call them "exceptions" if they did not involve the exercise of any executive power at all. *Id.*

*Second*, *Seila Law* highlights that in *Humphrey's Executor*, "[r]ightly or wrongly, the Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'" *Seila Law*, 591 U.S. at 215 (quoting *Humphrey's Ex'r*, 295 U.S. at 628)). This makes it into the summary of the holding: "In short, *Humphrey's Executor* permitted Congress to give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise *any* executive power." *Id.* at 216 (emphasis added). But we should not read into this because *Seila Law* cites *Wiener* as falling within the *Humphrey's Executor* exception. *See Seila Law*, 591 U.S. at 216. This could not be the case if

10

the exception applied only to agencies that were "said not to exercise *any* executive power." *Id.* (emphasis added). Neither *Wiener* nor *Seila Law* ever said such a thing about the War Claims Commission. *See generally Wiener*, 357 U.S. 349; *Seila Law*, 591 U.S. 197. The Court's summary of the *Humphrey's Executor* holding should therefore not be conflated with its description of the bounds of the *Humphrey's Executor* exception.

*Collins v. Yellen*, 594 U.S. 220 (2021), does not change this reading of *Seila Law*. The Government points to broad language from the opinion: "Courts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies, and we do not think that the constitutionality of removal restrictions hinges on such an inquiry." *Collins*, 594 U.S. at 253. But *Collins* was a case about single agency heads, not multimember agencies, so the *Humphrey's Executor* exception was not at issue. *See id.* at 251. The Court in *Collins* merely declined to create a *new* exception—beyond the two recognized in *Seila Law*—for single agency heads that exercise minimal executive power. *Id.* at 250. *Collins* even included a footnote right after the broad language that limited its reach to single agency heads. *See id.* at 253 n.19. That footnote distinguished two historical examples of removal restrictions by saying that "those agencies are materially different because neither of them operated beyond the President's control, *and one of them was led by a multi-member Commission*." *Id.* (emphasis added). So the language the Government identifies was not meant to apply to multimember agencies. And the Court expressly warned against reading *Collins* to apply to agencies not before the Court. *See id.* at 256 n.21. This would make little sense if *Collins* were meant to change *Seila Law*.[2]

---

[2] A Fifth Circuit panel recently offered its own distillation of the *Humphrey's Executor* exception. *See Consumers' Rsch. v. CPSC*, 91 F.4th 342 (5th Cir. 2024). And it did not deal with this broad language from *Collins* at all, *see id.*, suggesting that it did not read the language as bearing on the exception.

### 2.    The Structure of the FLRA

The first question is whether the FLRA's structure resembles how *Humphrey's Executor* described the "New Deal-era FTC." *Seila Law*, 591 U.S. at 218. *Humphrey's Executor* "identified several organizational features that helped explain its characterization of the FTC as non-executive." *Seila Law*, 591 U.S. at 216. First, the Board was "[c]omposed of five members" with "no more than three from the same political party," signaling that it was "designed to be 'non-partisan' and to 'act with entire impartiality.'" *Id.* at 216 (quoting *Humphrey's Ex'r*, 295 U.S. at 624). Second, "[t]he FTC's duties were 'neither political nor executive,' but instead called for 'the trained judgment of a body of experts' 'informed by experience.'" *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624). And third, "the Commissioners' staggered, seven-year terms enabled the agency to accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time.'" *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624).

All three features are present in the FLRA. First, the Authority has three Members, and no more than two of them may be "adherents of the same political party," which ensures bipartisanship. 5 U.S.C. § 7104(a). Second, "the FLRA was intended to develop specialized

---

There is also a more ambitious way to square *Collins*. As the Fifth Circuit noted, *id.* at 352 n.53, in *Seila Law*, the Chief Justice and two other Justices said that there "may be means of remedying the defect in the CFPB's structure," including, "for example, converting the CFPB into a multimember agency," 591 U.S. at 237 (opinion of Roberts, C.J.). This matters because the CFPB exercises "significant executive power," *id.* at 220 (majority opinion), suggesting the Court might be open to recognizing an exception for "traditional independent agenc[ies], run by a multimember board with a diverse set of viewpoints and experiences," *id.* at 205–06, regardless of the amount of executive power exercised. *Cf. Consumers' Rsch.*, 91 F.4th at 353–54 (arguing that a multimember agency is not removed from the *Humphrey's Executor* exception just because it exercises substantial executive power). After all, the Court said that the two definite exceptions "represent what *up to now* have been the outermost constitutional limits." *Seila Law*, 591 U.S. at 218 (emphasis added). If the Court were to take this step, then it would be true that "the constitutionality of removal restrictions" would not "hinge[]" on "the relative importance of the regulatory and enforcement authority of disparate agencies." *Collins*, 594 U.S. at 253.

expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the [Civil Service Reform Act]." *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 97 (1983). And third, each Member serves a staggered five-year term, allowing the agency to gain technical expertise. *See* 5 U.S.C. § 7104(c) (establishing five-year terms); CSRA, Pub. L. No. 95-454, § 7104(c)(1), 92 Stat. 1196 (1978) (staggering terms). The FLRA's structure therefore triggers the *Humphrey's Executor* exception.

### 3.    The Powers of the FLRA

The next step is to ensure that the FLRA does not exercise substantial executive power. *Seila Law*, 591 U.S. at 218–19. Whether an agency exercises substantial executive power is a fact-bound inquiry. *Humphrey's Executor* "acknowledged that between purely executive officers on the one hand, and officers that closely resembled the FTC Commissioners on the other, there existed 'a field of doubt' that the Court left 'for future consideration.'" *Seila Law*, 591 U.S. at 217 (quoting *Humphrey's Ex'r*, 295 U.S. at 632). This is because "[t]he versatility of circumstances often mocks a natural desire for definitiveness." *Wiener*, 357 U.S. at 252. In other words, bright-line rules are not always possible. But by all indications, none of the FRLA's powers identified by the Government qualifies as a substantial executive power.

*First*, the Government points to the fact that the FLRA "conduct[s] hearings and resolve[s] complaints of unfair labor practices." Defs.' Opp'n at 9 (quoting 5 U.S.C. § 7105(a)(2)(G)). They argue that this puts the FLRA in the same camp as the CFPB in *Seila Law*, which could "unilaterally issue final decisions awarding legal and equitable relief in administrative adjudications." *Id.* (quoting 591 U.S. at 219). And it is true that the FLRA's power to conduct hearings and resolve complaints is greater than was described in *Humphrey's Executor*, where the FTC merely "submit[ed] recommended dispositions to an Article III court." *Seila Law*,

13

591 U.S. at 218–19. But the ability to issue final judgments is not a death knell for removal protections. Just look at *Wiener*. There, the War Claims Commission "was established as an adjudicating body with all the paraphernalia by which legal claims are put to the test of proof, with finality of determination not subject to review by any other official of the United States or by any court by mandamus or otherwise." 357 U.S. at 354–55 (cleaned up). Yet the Commission still counts as an example of an agency that fits within the *Humphrey's Executor* exception. *See Seila Law*, 591 U.S. at 216.

*Second*, the Government points out that the FLRA "has the authority to litigate and enforce its orders in federal court." Defs.' Opp'n at 9. It highlights three facts. *See id.*

1. The FLRA can "require an agency or a labor organization to cease and desist" from statutory violations and "require [the agency or labor organization] to take any remedial action it considers appropriate to carry out the policies" of the FSLMRS. Defs.' Opp'n at 9 (quoting 5 U.S.C. § 7105(g)(3)). But *Humphrey's Executor* was unbothered by the FTC's ability to "issue and cause to be served a cease and desist order." 295 U.S. at 620. And the FLRA's other tools do not resemble the wide range of remedies available to the CFPB in *Seila Law*, which included restitution, disgorgement, and "civil penalties of up to $1,000,000 (inflation adjusted) *for each day* that a violation occurs." 591 U.S. at 206.

2. The FLRA "may petition to enforce such an order in federal court[.]" Defs.' Opp'n at 9 (citing 5 U.S.C. § 7123(b)). It is true that *Seila Law* said that "the power to seek daunting monetary penalties against private parties in federal court" is "a quintessentially executive power[.]" 591 U.S. at 199. But it is not clear that the object of an FLRA order—an agency or labor union— should be considered a private party for this analysis. And either way, this is not a *substantial* exercise of executive power. In *Humphrey's Executor*, if an FTC "order [was] disobeyed, the

commission [could] apply to the appropriate Circuit Court of Appeals for its enforcement." 295 U.S. at 620–21. This posed no problem. *Id.* at 629.

3. The FLRA "has independent litigation authority to send its own attorneys (not Department of Justice attorneys) to litigate civil actions outside the Supreme Court in connection with any of its functions." Opp'n at 9 (citing 5 U.S.C. § 7105(h)). But again, it is not clear why this would make the power more substantial. When *Seila Law* described the CFPB's enforcement powers, it did not even mention whether the attorneys belonged to the CFPB. *See* 591 U.S. at 206. It was much more concerned about the scale of relief. *See id.* ("Since its inception, the CFPB has obtained over $11 billion in relief for over 25 million consumers, including a $1 billion penalty against a single bank in 2018.").

*Third*, the Government notes that the FLRA has the power to "prescribe rules and regulations to carry out the provisions of the [FSLMRS] applicable to [it]." Defs.' Opp'n at 9 (quoting 5 U.S.C. § 7134). This includes (1) specifying the criteria for determining when a labor organization represents "a substantial number of the employees of the agency," which allows the labor organization to be granted consultation rights by the agency, 5 U.S.C. §§ 7105(a)(2)(C), 7113(a); (2) determining whether an agency has a "compelling need" for an agency-wide regulation, which would allow the agency to avoid having to bargain in good faith with a proposal by a labor organization, 5 U.S.C. §§ 7105(a)(2)(D), 7117(b); *see also* Fed. Lab. Rels. Auth., *The Negotiability Guide* (June 17, 2013); and (3) determining "who is eligible to vote" for labor organization recognition and establishing the "rules governing such an election," subject to certain statutory limitations, 5 U.S.C. §§ 7105(a)(2)(B), 7111(d).

These narrow, largely administrative regulatory assignments pale in comparison to what was feared in *Seila Law*, where "the [CFPB] Director possess[ed] the authority to promulgate

binding rules fleshing out 19 federal statutes, including a broad prohibition on unfair and deceptive practices in a major segment of the U.S. economy." 591 U.S. at 218. The FLRA promulgates regulations under fewer statutes, Motions H'rg (Mar. 7, 2025), Draft Tr. at 31: 16–17; those statutes provide more guidance than the broad prohibition of "unfair and deceptive practices," *Seila Law*, 591 U.S. at 218; and the federal workforce is a smaller segment of the economy than was covered by the CFPB statutes, which included "everything from credit cards and car payments to mortgages and student loans," *id.* at 219.

### 4.    Other *Seila Law* Factors

*Seila Law* mentions other factors as well, although it is unclear how they should fit into the *Humphrey's Executor* exception. *See Consumers' Rsch. v. CPSC*, 91 F.4th 342, 355–56 (5th Cir. 2024). The Court need not solve this puzzle, however, because none of these factors apply.

*First*, the FLRA's structure is not "almost wholly unprecedented." *Seila Law*, 591 U.S. at 220. To the contrary, agencies like the FLRA are part of the fabric of our federal government. Congress has created independent multimember agencies for nearly a century and a half. *See* Marshall J. Berger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1116 (2000). The "structure, role, and functions of the [FLRA] were closely patterned after those of the NLRB." *Library of Congress v. FLRA*, 699 F.2d 1280, 1287 (D.C. Cir. 1983). And the powers of the NLRB were modeled after those of the FTC, *Dish Network Corp. v. NLRB*, 953 F.3d 370, 375 n.2 (5th Cir. 2020), only one month after *Humphrey's Executor* approved of the FTC's removal protections, *Free Enterprise Fund*, 561 U.S. at 547 (Breyer, J., dissenting). The FLRA is "a traditional independent agency, run by a multimember board with a diverse set of viewpoints and experiences." *Seila Law*, 591 U.S. at 205–06 (cleaned up).

16

*Second*, the FLRA has levers of Presidential accountability. The CFPB Director served a five-year term, leaving some Presidents without "any opportunity to shape its leadership and thereby influence its activities." *Seila Law*, 591 U.S. at 225. But the FLRA Members serve staggered five-year terms, allowing every President to wield influence over the agency. *See* 5 U.S.C. § 7104(c) (establishing five-year terms); CSRA, Pub. L. No. 95-454, § 7104(c)(1), 92 Stat. 1196 (1978) (staggering terms). If the President follows the ordinary course and nominates someone to replace Ms. Grundmann, her term would end on July 1, 2025. Defs.' Statement of Undisputed Material Facts (Defs.' SUMF) ¶ 1, ECF No. 11-2. The CFPB also received funds "outside the appropriations process," which "further aggravate[ed] the agency's threat to Presidential control." *Seila Law*, 591 U.S. at 226. But the FLRA receives its funding through the appropriations process, Further Consolidated Appropriations Act, Pub. L. No. 118–47, 138 Stat. 461 (2023), allowing the President "to recommend or veto spending bills that affect the operation of [the agency]," *Seila Law*, 591 U.S. at 226.

And that is not all. The General Counsel of the FLRA, who may investigate labor practices and prosecute complaints, "may be removed at any time by the President." 5 U.S.C. § 7104(f). With the selection of the General Counsel, the President can immediately influence the FLRA's investigative and prosecutorial power. The President may also "designate one member [of the FLRA] to serve as Chairman of the Authority," who serves as "the chief executive and administrative officer. *Id.* § 7104(b). And this title that may be revoked at will. Pl.'s Reply at 10; *see, e.g.*, Fed. Lab. Rels. Auth., Press Release, Patrick Pizzella Designated Acting FLRA Chairman (Sept. 10, 2019), https://perma.cc/ED2R-HVKG. There are therefore no additional features of the FLRA that render its Members' removal protections "even more problematic." *Seila Law*, 591 U.S. at 225.

*** 

A straightforward reading of Supreme Court precedent thus resolves the merits of this case. The FLRA triggers and satisfies the *Humphrey's Executor* exception, making the FSLMRS removal provision a valid exercise of Congress's constitutional authority. Although the Government claims fidelity to *Humphrey's Executor* and the cases that follow, its arguments seem to contemplate absolute presidential authority over the removal of federal officers and would leave *Humphrey's Executor* toothless. Indeed, it is difficult to conceive of a federal agency that would fit within the *Humphrey's Executor* exception as the Government reads it. But it has been clear for almost a century that Article II does not give the President an "illimitable power of removal" over all federal officers. *Humphrey's Executor*, 295 U.S. at 629.

When pressed at oral argument to identify existing federal agencies that would satisfy the *Humphrey's Executor* exception, the Government identified only a single agency: the Federal Reserve. Motions H'rg (Mar. 7, 2025), Draft Tr. at 36:19–20. But the Government declined to explain why the Federal Reserve would fit within the exception under the broad arguments it advances in this case. *Id.* at 36:21–37:5. The Federal Reserve sets the federal funds rate, 12 U.S.C. §§ 225, 263, which permeates every corner of the American economy. If control over that does not rise to an exercise of substantial executive power, then neither does laying down the administrative rules for labor organizing within the federal workforce.

## REMEDIES

The Court now turns to the question of remedies. Ms. Grundmann requests both declaratory and injunctive relief. See Compl., Prayer for Relief, ¶¶ 1–2. The Government broadly argues that the Court lacks the authority to award either and is instead limited to an award of backpay to Ms. Grundmann. Motions H'rg (Mar. 7, 2025), Draft Tr. at 45:1–19. According to the

18

Government, because prior removed officials chose to seek backpay only, the Court may not award more than that. The Government held this line at oral argument, insisting that an Article III court is without authority to award relief to redress the injury caused by a President exceeding his Article II authority and intruding on Congress's Article I authority. *Id.* at 46:11. The Court disagrees. Ms. Grundmann is entitled to a declaratory judgment saying that her removal was unlawful. And she has also met her burden to receive the permanent injunction that she seeks.

### A.    Declaratory Relief

The Plaintiff requests that the Court "[d]eclare that Ms. Grundmann was unlawfully removed as a member of the [FLRA]." Compl., Prayer for Relief, ¶ 1. The Court has the authority to issue such a declaratory judgment, and it exercises its discretion to do so.

The Declaratory Judgment Act (DJA) provides that, "in a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, *whether or not* further relief is or could be sought." 28 U.S.C. § 2201(a) (emphasis added). The DJA "alone does not provide a court with jurisdiction," *California v. Texas*, 593 U.S. 659, 672 (2021), but it does "enlarge[] the range of remedies available in the federal courts" that have established jurisdiction, *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). This Court has jurisdiction over this federal-question case because, at minimum, it could provide backpay to establish redressability. *See* Compl., Prayer for Relief, ¶ 3 (asking for "all other appropriate relief"); Motions H'rg (Mar. 7, 2025), Draft Tr. at 45:1–46:12 (conceding backpay is available). So the DJA allows for declaratory relief.

In its reply brief, the Government appears to take the position that the Court may not award "declaratory relief stating that the President's removal of Plaintiff was unlawful." *See* Defs.' Reply

at 15. In support, they cite a single quote from a concurring opinion that is inapposite and not binding on this Court. *See Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part and concurring the judgment) ("I think we cannot issue a declaratory judgment against the President."). When pressed at oral argument, the Government walked this back and agreed that the Court could issue a declaratory judgment saying that Ms. Grundmann's removal was unlawful. Motions H'rg (Mar. 7, 2025), Draft Tr. at 42:19-20 ("A declaratory judgment saying that the removal was unlawful I think would be an acceptable outcome."). To be sure, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). That applies even when the person violating the law is the President. *See, e.g.*, *Clinton v. New York*, 524 U.S. 417, 421 (1998) (affirming a declaratory judgment invalidating the President's power to wield a line-item veto pen as unconstitutional).

The Government also makes a more modest argument that declaratory relief is generally unavailable whenever injunctive relief is unavailable. *See* Defs.' Reply at 15. They cite *Samuels v. Mackell* for support. 401 U.S. 66, 73 (1971) ("[W]here an injunction would be impermissible under these principles, declaratory relief should ordinarily be denied as well."). But *Samuels* merely extended *Younger* abstention to relief under the Declaratory Judgment Act from ongoing state criminal prosecutions, explaining that a declaratory judgment could have a res judicata effect on the state court proceedings that is not meaningfully different from an injunction. *See id.* at 68, 73 ("[T]he basic policy against federal interference with pending state criminal prosecutions will be frustrated as much by a declaratory judgment as it would be by an injunction."). The Court "express[ed] no views on the propriety of declaratory relief when no state proceedings is pending at the time the federal suit is begun." *Id.* at 73. So *Samuels* does not apply.

20

"[I]t is well settled that a declaratory judgment always rests within the sound discretion of the court." *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980). A declaratory judgment will "ordinarily be granted only when it will either 'serve a useful purpose in clarifying the legal relations in issue' or 'terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Id.* (quoting E. Borchard, Declaratory Judgments 299 (2d ed. 1941)). The case before the Court involves legal relations that clearly need to be clarified. Ms. Grundmann has challenged her removal by the President as unlawful and needs to know if she can resume her work on the Authority. On the other side, the Government argues that Congress overstepped when it enacted a provision limiting the President's ability to remove Members of the FLRA without cause. The Court therefore exercises its discretion and provides the requested declaratory relief.

### B.    Injunctive Relief

The question of injunctive relief is more difficult. An injunction ordering the President to reinstate Ms. Grundmann would raise complicated questions about the separation of powers. And the availability of such an order may turn on technical differences between equitable remedies and legal remedies. These questions can largely be avoided, however, because Ms. Grundmann has never sought reinstatement from the President and ultimately requests a type of injunction that has been blessed by the D.C. Circuit. The Court therefore has the authority to issue the requested injunctive relief, and it finds that such relief is warranted.

### 1.    Availability of Injunctive Relief

Ms. Grundmann has requested various types of injunctive relief throughout these proceedings. She originally asked the Court to enter an injunction ordering Ms. Kiko to reinstate her as a Member of the Authority. But Ms. Kiko lacks the authority to formally reinstate Ms. Grundmann, and it is not clear how such an injunction could be squared with *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), given the plausible evidence that wrongfully removed executive officers were historically reinstated by courts of law instead of courts of equity. Fortunately for Ms. Grundmann, the D.C. Circuit has twice recognized a more modest equitable remedy when an officer has been removed by the President. *See Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996), and *Severino v. Biden*, 71 F.4th 1038 (D.C. 2023). These cases teach that courts may order the members of an agency—or even just the Chair—to recognize the unlawfully removed member as a member and to halt any efforts to hinder her work in that capacity. While this relief may be less complete than formal reinstatement, the D.C. Circuit has said that it strikes the right balance between respecting the rule of law and avoiding conflicts between the branches of government. The Plaintiff now requests this more modest relief, and the Court has the authority to grant it.

### a.  Formal Reinstatement

In her Complaint, Ms. Grundmann asked the Court to "[e]nter an injunction against Defendant Kiko, ordering her to reinstate Ms. Grundmann as a member of the Board and to refrain from taking any further action to obstruct Ms. Grundmann's ability to carry out her duties." Compl., Prayer for Relief, ¶ 2. There are two problems with this request.

*First*, Ms. Kiko lacks the authority to reinstate Ms. Grundmann. "Members of the Authority shall be appointed by the President by and with the advice and consent of the Senate."

22

5 U.S.C. § 7104(b). The Plaintiff conceded this at oral argument. *See* Motions H'rg (Mar. 7, 2025), Draft Tr. at 18:12–16.

*Second*, it is not clear how such an injunction can be squared with *Grupo*. The Supreme Court in *Grupo* taught that "the general availability of injunctive relief . . . depend[s] on traditional principles of equity jurisdiction." 527 U.S. at 318–19 (internal citations omitted). This means that "unless Congress expressly provides otherwise, equitable remedies must track remedies traditionally afforded by the equity courts." *Goodluck v. Biden*, 104 F.4th 920, 924 (D.C. Cir. 2024) (citing *Grupo*, 527 U.S. at 318–19). But a preliminary review of the historical record suggests that, at least by the late nineteenth century, wrongfully removed executive officers sought relief in courts of law, not courts of equity. *See White v. Berry*, 171 U.S. 366 (1898); *In re Sawyer*, 124 U.S. 200 (1888). Whether this was already true at the Founding is less clear.

It is easy to find evidence from the turn of the last century. In 1888, the Supreme Court said it was "well settled that a court of equity has no jurisdiction over the appointment and removal of public officers." *In re Sawyer*, 124 U.S. at 212. And it repeated that statement ten years later. *White*, 171 U.S. at 377; *see also Harkrader v. Wadley*, 172 U.S. 148, 165 (1898). According to the Court, "[t]he jurisdiction to determine the title to a public office belong[ed] exclusively to the courts of law, and [was] exercised either by *certiorari*, error, or appeal, or by *mandamus*, prohibition, *quo warranto*, or information in the nature of the writ of *quo warranto*." *In re Sawyer*, 124 U.S. at 212; *see also White*, 171 U.S. at 377. This is consistent with treatises from the time. *See, e.g.*, 2 James L. High, *A Treatise on the Law of Injunctions* § 1312 (2d ed., Chicago, Callaghan & Co., 1880) ("No principle of the law of injunctions, and perhaps no doctrine of equity jurisprudence, is more definitely fixed or more clearly established than that courts of equity will not interfere by injunction to determine questions concerning the appointment of public officers

or their title to office."); Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* § 496 (Chicago, Callaghan & Co., 1890) (saying quo warranto allows courts "not only to oust the respondent [officer] but also to install the relator [officer]"). And the Supreme Court reiterated this view shortly before the merger of law and equity. *See Walton v. House of Representatives of Okla.*, 265 U.S. 487, 490 (1924) ("A court of equity has no jurisdiction over the appointment and removal of public officers"). So it was not a stretch for the Court to say that these cases "reflect . . . a traditional limit upon equity jurisdiction." *Baker v. Carr*, 369 U.S. 186, 231 (1962).

But evidence from the 1880s might not settle the *Grupo* debate. *See Grupo*, 527 U.S. at 318 (discussing equitable principles "at the time of the separation of the two countries" (quoting *Atlas Life Ins. Co. v. W.I. Southern, Inc.*, 306 U.S. 563, 568 (1939))); *id.* at 335 (Ginsburg, J., concurring in part and dissenting in part) (discussing equitable principles "at the time of the founding"); *Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., dissenting) (discussing equitable remedies "at the time of the Nation's founding"). And the earlier evidence is sparse.

The Court looks in vain to *In re Sawyer* for help. 124 U.S. 200. The Court there said that "[n]o English case has been found of a bill for an injunction to restrain the appointment or removal of a municipal officer." *Id.* at 212. But this argument from silence is far from determinative. And the only English cases cited dealt with corporate officers. *See Att'y Gen. v. Earl of Clarendon*, 17 Ves. Jr. 490, 498, 34 Eng. Rep. 190, 193 (Ch. 1810); *Queen v. Saddlers' Co.*, 10 H.L. Cas. 404 (1863); *Osgood v. Nelson*, L. R. 5 H. L. 636 (1872). The Court also cited many "well-considered" state court cases denying "the power of a court of equity to restrain by injunction the removal of a municipal officer." *In re Sawyer*, 124 U.S. at 212. But all of those cases were decided at least a half century after the Founding. *See Tappan v. Gray*, 7 Hill 259 (N.Y. 1843); *Hagner v. Heyberger*, 3 Pa. L.J. 370 (1844); *Updegraff v. Crans*, 47 Pa. 103 (1864); *Cochran v. McCleary*, 22 Iowa 75

(1867); *Delahanty v. Warner*, 75 Ill. 185 (1874); *Sheridan v. Colvin*, 78 Ill. 237 (1875); *Dickey v. Reed*, 78 Ill. 261 (1875); *Harris v. Schryock*, 82 Ill. 119 (1876); *Beebe v. Robinson*, 52 Ala. 66 (1875); *Moulton v. Reid*, 54 Ala. 320 (1875); *cf. State v. Sheldon*, 6 N.W. 757 (Neb. 1880); *State v. Oleson*, 18 N.W. 45 (Neb. 1883); *State v. Meeker*, 27 N.W. 427 (Neb. 1886).

The vintage of these cases matters. *In re Sawyer* itself recognized that the Supreme Court of Alabama had only recently decided that reinstatement was not available in equity, "overruling its own prior decisions to the contrary." 124 U.S. at 214 (citing *Beebe*, 52 Ala. 66; *Moulton*, 54 Ala. 320). Those prior decisions had allowed courts of equity to enjoin an unlawfully appointed sheriff where the incumbent sheriff could not proceed by *quo warranto*, *Bruner v. Bryan*, 50 Ala. 522, 529 (1874), and to exercise jurisdiction over a dispute about the identity of the true mayor because a *quo warranto* "would not be a complete remedy," *Reid v. Moulton*, 51 Ala. 255, 266 (1874). This flip-flopping could be read as evidence that the consensus view recognized in *In re Sawyer* was not as well-established at the Founding. But the Court need not come to a firm conclusion on this point since the Plaintiff now seeks different relief.

### b. De Facto Reinstatement

This brings us to the relief that is really at issue. In her later briefing and at oral argument, Ms. Grundmann clarified that she seeks only the relief discussed in *Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996), and *Severino v. Biden*, 71 F.4th 1038 (D.C. 2023). That is, she "seeks injunctive relief from Defendant Kiko, a subordinate official, to treat her as a de facto member of the FLRA." Pl.'s Reply at 14. While resuming her work on the Authority "in this *de facto* fashion might not be as complete a remedy for [the Plaintiff] as an official reinstatement by the President," *Swan*, 100 F.3d at 980, the D.C. Circuit has twice recognized that this relief is available and advisable. *See id.* at 979–81; *Severino*, 71 F.4th at 1042–43.

The D.C. Circuit is no stranger to removal challenges. In *Swan*, a Senate-confirmed Board member of an independent agency was removed by President Clinton after being appointed by President Bush. *See* 100 F.3d at 975–76. He sued President Clinton and some staff who had implemented the firing, "seeking to have his removal . . . declared unlawful and to obtain injunctive relief ordering his reinstatement as a member of the Board." *Id.* at 975. The district court granted summary judgment for the government, and the plaintiff appealed. *Id.* at 976. On appeal, the D.C. Circuit assessed the plaintiff's standing, focusing on the redressability prong. *See id.* at 976. It questioned "whether a federal court has the power to grant injunctive relief against the President of the United States in the exercise of his official duties." *Id.* at 976.

Resolving this question required balancing two important values. On the one hand, the Court recognized the "bedrock principle that our system of government is founded on the rule of law, and it is sometimes a necessary function of the judiciary to determine if the executive branch is abiding by the terms of legislative enactments." *Id.* at 978. On the other hand, ordering the President "to perform particular executive [acts] . . . at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers." *Id.* (internal quotation marks and citations omitted). The Court struggled to resolve this tension the usual way, by enjoining a subordinate official, "because only the President has the power to remove or reinstate [the] Board members." *Id.* at 979.

The Court then concluded that certain subordinate officials had enough authority to "substantially redress" the injury without formal reinstatement. *See id.* at 979. The Executive Director of the agency "could direct the staff to treat [the plaintiff] as a Board member." *Id.* at 979. And although they were not initially named in the complaint, the "Chairman, other NCUA Board members[, and] the Board Secretary" could accomplish reinstatement "*de facto* by treating Swan

26

as a member of the NCUA Board and allowing him to exercise the privileges of that office." *Id.* at 979–80. The Court decided that such "partial relief [was] sufficient for standing purposes when determining whether [it could] order more complete relief would require [it] to delve into the complicated and exceptionally difficult questions regarding the constitutional relationship between the judiciary and the executive branch." *Id.* at 981.

The D.C. Circuit recited this same analysis just two years ago. In *Severino*, a member of the Administrative Conference of the United States Council was removed by President Biden after being appointed by President Trump. *See* 71 F.4th at 1041. He sued President Biden and others, "request[ing] that the court issue an injunction requiring that the President restore him to his position on the Council." *Id.* at 1041 (cleaned up). The Court again assessed redressability, looking to *Swan* for guidance. *Severino*, 71 F.4th at 1042–43. It declined to answer whether such an injunction could run against the President because it could "enjoin 'subordinate executive officials' to reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment." *Id.* at 1042–43 (quoting *Swan*, 100 F.3d at 980). It explained that the Conference's Chairperson could include the plaintiff in Board meetings and give him access to his former office, among other things, thereby providing partial relief. *Id.* at 1043.

The Government argues that *Swan* and *Severino* are inapposite because they are standing cases. *See* Defs.' Reply at 11–12. The Court disagrees. The redressability analysis asks whether it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Swan*, 100 F.3d at 976 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). So a remedy cannot establish redressability if it is beyond the authority of the court. *See, e.g.*, *Ege v. U.S. Dep't of Homeland Sec.*, 784 F.3d 791, 793 (D.C. Cir. 2015) ("And because we have no jurisdiction under 49 U.S.C. § 46110 to issue an order binding the TSC, we *ipso facto*

27

cannot redress Ege's injury even if we were inclined to agree with him."); *Newdow v. Roberts*, 603 F.3d 1002, 1010 (D.C. Cir. 2010) (identifying a redressability problem because "[i]t is impossible for this court to grant such relief"); *Love v. Vilsack*, 908 F. Supp. 2d 139, 144–45 (D.D.C. 2012) ("To satisfy [redressability], a plaintiff must show in the first instance that the court is capable of granting the relief sought."). *Swan* itself assessed redressability only because "[a] question exists . . . as to whether a federal court has the power to grant injunctive relief against the President." 100 F.3d at 976. It therefore makes little sense to hermetically seal the question of redressability from that of remedial availability.

And this Court is in good company reading *Swan* and *Severino* as standing for the proposition that such de facto reinstatement is an available remedy. *See, e.g.*, *Harris v. Bessent*, -- F. Supp. 3d --, No. 25-cv-412, 2025 WL 521027 (D.D.C. Feb. 18, 2025) (Contreras, J.); *Dellinger v. Bessent*, -- F. Supp. 3d --, No. 25-cv-385, 2025 WL 665041 (D.D.C. Mar. 1, 2025) (Berman Jackson, J.); *Wilcox v. Trump*, -- F. Supp. 3d --, No. 25-cv-334, 2025 WL 720914 (D.D.C. Mar. 6, 2025) (Howell, J.); *Spicer v. Biden*, 575 F. Supp. 3d 93, 97 (D.D.C. 2021) (Friedrich, J.) ("Following *Swan*, the Court could grant effective relief in this case by ordering Ruppersberger and Thalakottur, in their capacities as the Board's Chairman and DFO, to treat the plaintiffs are full members of the Board.").

The Government's other arguments seem to ignore the existence of *Swan* and *Severino* altogether. First, it argues that "[w]hen executive officers have challenged their removal by the President, they have traditionally sought back pay, not reinstatement." Defs.' Opp'n at 12 (citing *Parsons v. United States*, 167 U.S. 324, 326 (1897); *Shurtleff v. United States*, 189 U.S. 311, 318 (1903); *Myers*, 272 U.S. at 106; *Humphrey's Ex'r*, 295 U.S. at 612; *Wiener*, 357 U.S. at 350). But reinstatement was not an issue in *Humphrey's Executor* or *Myers* because

28

those plaintiffs were both deceased. *See Humphrey's Ex'r*, 295 U.S. at 618–19; *Myers*, 272 U.S. at 106. Nor did it make sense in *Wiener* since the Commission had been abolished. *See* 357 U.S. at 350–51. And any argument from past practice should account for the cases where the plaintiffs *did* seek reinstatement. *See Swan*, 100 F.3d at 361; *Severino*, 71 F.4th at 1041.

Second, the Government argues that "members of the First Congress argued against requiring the Senate's advice and consent for removals precisely because of the risk that such a procedure would require the President to retain someone he had sought to remove." Defs.' Opp'n at 13. It points to three Representatives in particular. *See id.* (citing *Myers*, 272 U.S. at 124 (saying that Rep. Benson worried that "the President would then have a man forced on him whom he considered as unfaithful"); *id.* at 131–32 (saying that Rep. Boudinot bemoaned a situation where the President would be "surrounded by officers . . . in whom he can have no confidence"); *id.* at 132 (saying that Rep. Sedwick asked whether such "a man under these circumstances" should "be saddled upon the President")). But this paints with too broad a brush. Those very same Representatives highlighted the special danger of removal protections for the office at issue—the Secretary of Foreign Affairs—on the ground that "the direction of our foreign relations" was an "unquestioned field of executive prerogative." Edward S. Corwin, *Tenure of Office and the Removal Power Under the Constitution*, 27 Colum. L. Rev. 353, 364–66 (1927) (collecting quotations). So their concerns may well have been limited to the character of the office. *See id.* at 366 And in any case, three individuals cannot speak for the entire First Congress, especially considering the wide spectrum of opinion it expressed on removal protections. *See id.* at 361–62. The "implications of the debate, properly understood, were highly ambiguous and prone to overreading." John F. Manning, *Separation of Powers as Ordinary*

*Interpretation*, 124 Harv. L. Rev. 1939, 1965 n.135 (2011). The Court declines to enter this historical fray.

Third, the Government argues that *Grupo* forecloses reinstatement, "[w]hether the order is expressly directed at the President or not." Defs.' Opp'n at 15. But this argument fails to appreciate the nuance of the remedy recognized in *Swan* and *Severino*. The Court has already acknowledged the strong—albeit imperfect—evidence that reinstatement was not traditionally available in a court of equity. *See supra* at 23–25. But that evidence does not clearly extend to de facto reinstatement; nor does the Government offer a theory for how it could. The Court is particularly hesitant to second-guess its authority to order de facto reinstatement now that the D.C. Circuit has reaffirmed the remedy's availability even after *Grupo*. *See Severino*, 71 F.4th at 1042–43.

Finally, the Government invites the Court to consider afresh the values already weighed by the D.C. Circuit in *Swan* and *Severino*. It argues that the "Plaintiff's injunction necessarily targets the President." Defs.' Reply at 11 (cleaned up). But issuing no relief at all would undermine "the bedrock principle that our system of government is founded on the rule of law." *Swan*, 100 F.3d at 978. The Court therefore defers to the careful balance struck by the D.C. Circuit in *Swan* and *Severino*, which are binding on this Court.

For all of these reasons, the Court concludes that it has the authority to order injunctive relief as to Ms. Kiko.[3]

---

[3] In a Notice of Supplemental Authority and at oral argument, the Plaintiff asks the Court to consider a writ of mandamus as an alternative remedy. *See* ECF No. 17 at 1. Given the lack of briefing on mandamus as a remedy, the Court leaves it for another day. But as other courts in this District have found, a writ of mandamus may well be an available remedy were injunctive relief unavailable in this case. *See, e.g.*, *Harris v. Bessent*, No. 25-cv-412, 2025 WL 679303, at *11 (D.D.C. Mar. 4 2025); *Wilcox v. Trump*, No. 25-cv-334, 2025 WL 720914, at *16 n.22 (D.D.C. Mar. 6, 2025).

### 2.    Permanent Injunction

Having established its authority to grant injunctive relief, the Court now addresses whether an injunction is appropriate in this case. "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* Ms. Grundmann has satisfied all four factors. The Court therefore grants a permanent injunction.[4]

### a.  Irreparable Harm and Inadequate Remedy at Law

The first two factors "are often considered together." *Wilcox*, 2025 WL 720914, at *15 n.20 (citing *Ridgley v. Lew*, 55 F. Supp. 3d 89, 98 (D.D.C. 2014)). And Ms. Grundmann has satisfied both. Her "unlawful removal from office by the President" was an irreparable harm. *Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (Mem.) (D.C. Cir. 1983). And as the Government conceded at oral argument, there is no available remedy at law that would effectuate her reinstatement. *See* Motions H'rg (Mar. 7, 2025), Draft Tr. at 45:18–46:12.

---

[4] The Plaintiff filed a Motion for Preliminary Injunction and Summary Judgment. *See* Pl.'s Mot. In her Reply, she sought only a permanent injunction. *See* Pl.'s Reply at 11–21. The Government has argued that the Plaintiff is not entitled to a preliminary injunction or permanent injunction. *See* Defs.' Opp'n at 16 n.5. Because this Court grants the Plaintiff's Motion for Summary Judgment, it awards a permanent injunction.

Ms. Grundmann claims that "[h]er removal has deprived her of her statutory right to function in her office." Pl.'s Reply at 16. And courts in this District have recognized that this harm can be irreparable. *See, e.g.*, *Berry*, 1983 WL 538, at *5 (recognizing as irreparable the plaintiffs' "deprivation of their statutory right to function as Commissioners"); *Wilcox*, 2025 WL 720914, at *15 (recognizing as irreparable the plaintiff's deprivation "of a presidentially appointed and congressionally confirmed position of high importance"). The Government argues that loss of employment does not amount to an irreparable harm because backpay is available. *See* Defs.' Opp'n at 17–18 (citing *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974)). But *Sampson* expressly contemplates "that cases may arise in which the circumstances surrounding an employee's discharge . . . may so far depart from the normal situation that irreparable injury might be found." 415 U.S. at 92 n.68. This is such a "genuinely extraordinary situation." *Id.* Far from a mere claim of lost employment, this is a case of constitutional significance. Backpay does not get Ms. Grundmann back into her role as a Member of the FLRA—a role that the President appointed her to, that the Senate confirmed her for, in an agency that both Congress and the President in their considered judgment created *to be independent* and free from political meddling. *See Harris*, 2025 WL 679303, at *13. A check in the mail does not address the gravamen of this lawsuit. Perhaps that is why Ms. Grundmann has not even asked for one.

According to the Government, several cases "reject[] the notion that the deprivation of a unique, singular, or high-level position is any more of an irreparable injury." Defs.' Opp'n at 17–18. But the Government's cases cannot support such a broad rule. *See id.* (cases involving corporate managers, subordinate local and state officials, lower-level federal employees, and a credit union board member). Ms. Grundmann is a Senate-confirmed principal officer of a congressionally-created independent agency. She accepted the President's nomination and earned

Senate confirmation in order to serve her country at the highest possible level in her field. This represented the capstone of her long career in public service, *see* Pl.'s Decl. ¶ 7, and her unlawful termination deprived her of the opportunity to make her mark in this statutorily protected role.

### b. Balance of the Equities and Public Interest

The final two injunction factors merge when the Government is a party. *Wilcox*, 2025 WL 720914, at *17 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). And Ms. Grundmann has satisfied both. The Authority needs all three voters to avoid deadlock, especially at a time when there have been mass firings across the federal government. And the Government's arguments about the separation of powers actually weigh *in favor* of an injunction.

Without this relief, the Authority has only two of its three Members. This runs the risk of letting cases deadlock with no tiebreaker, which would cause those cases to go into abeyance. Pl.'s Mot. at 14; *see also* Pl.'s Decl. ¶ 7. This is not mere speculation either. "[D]uring the eighteen-month period that Plaintiff Grundmann served as part of a two-member Authority, approximately one-third of the Authority's cases deadlocked, leading to duplicative disputes and resource waste." Pl.'s Mot. at 14. Abeyance "results in increased costs and confusion to the parties" and adds "to the bottom line of the agencies, the cost of which is ultimately borne by taxpayers." Pl.'s Decl. ¶ 10. "It also creates legal uncertainty and likely inconsistency in labor practices the longer key labor issues remain unsolved." Pl.'s Reply at 20. And this would be a particularly bad time for deadlock considering the widespread firings across the federal workforce in recent months. *See* Pl.'s Mot. at 15; Pl.'s Reply at 20. In fact, only weeks ago, a court in this District told fired federal workers to pursue their claims before the FLRA before seeking judicial relief. *See Nat'l Treasury Emps.' Union v. Trump*, No. 25-cv-420, 2025 WL 561080, at *8 (D.D.C. Feb. 20, 2025). Leaving the Authority with only two voters would make that instruction hollow.

The Government argues that providing this relief raises grave separation-of-powers concerns. *See* Defs.' Opp'n at 19. They say that "[s]uch a remedy would undermine the accountability of the Executive Branch enshrined in the Constitution" and that "[t]he Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" *Id.* at 20 (citing *Sampson v. Murray*, 415 U.S. 61, 83 (1974)). But the Government ignores the separation-of-powers risks posed by non-intervention. If the Government had its way, it would place unchecked power in the hands of the President, which is antithetical to our system of government. Again, nearly fifty years ago, Congress and the President worked together to create the FLRA as an independent agency. The President appointed Ms. Grundmann to her position, and the Senate confirmed her. The two political branches decided to give her removal protections—protections that have now been ruled constitutional by a federal court. Providing no injunctive relief would allow the President to flout not only Congress's Article I power to create independent multimember agencies, but also the Court's Article III power to maintain the rule of law, *see Swan*, 100 F.3d at 978.[5]

Congress has already balanced the equities at stake in this case. The FLRA "safeguards the public interest" and "contributes to the effective conduct of public business." 5 U.S.C. § 7101(a)(1). "[L]abor organizations and collective bargaining in the civil service are in the public interest," and "the public interest demands . . . the efficient accomplishment of the

---

[5] The Government also argues that the President "cannot be compelled to retain the services of a principal officer whom the President no longer believes should be entrusted with the exercise of executive power." *See* Defs.' Opp'n at 20. But Congress set forth permissible limits on the President's ability to remove Ms. Grundmann. And the Government has made no attempt to establish inefficiency, neglect of duty, or malfeasance in office on Ms. Grundmann's part. Absent cause to remove Ms. Grundmann, the President may of course nominate someone to replace her when her term expires in less than four months. Curiously, although the FLRA's General Counsel may be removed at will, the President has taken no steps to remove that officer.

operations of the Government." *Id.* § 7101(a)(2). The public interest therefore favors Ms. Grundmann, and a permanent injunction is warranted.

## CONCLUSION

For the foregoing reasons, the Court grants the Plaintiff's Motion for Summary Judgment and denies the Defendants' Cross-Motion for Summary Judgment.

The Court has issued a separate order consistent with this Memorandum Opinion.

 

 

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:   March 12, 2025